Alan M. ADLER, Plaintiff–Appellant,

v.

George PATAKI, in his official and individual capacity, Thomas F. Doherty, in his official and individual capacity, James Natoli, in his official and individual capacity, Michael Finnegan, in his official and individual capacity, Dennis C. Vacco, in his official and individual capacity, William Flynn, in his official and individual capacity, Donald P. Berens, in his official and individual capacity, Thomas A. Maul, in his official and individual capacity, Defendants–Appellees.

Docket No. 98–9022.

United States Court of Appeals, Second Circuit.

Argued April 5, 1999.

Decided July 20, 1999.

Sue H.R. Adler, Albany, N.Y., for plaintiff-appellant.

Fredric S. Newman, New York, N.Y. (Melissa L. Weiss, Hoguet Newman & Regal, New York, N.Y., on the brief), for defendants-appellees Pataki, Doherty, Natoli, Finnegan and Maul.

Charles D. Cunningham, New York, N.Y. (Franklyn H. Snitow, Snitow & Cunningham, New York, N.Y., on the brief), for defendants-appellees Vacco, Flynn and Berens.

Before: NEWMAN, WALKER, and SOTOMAYOR, Circuit Judges.

JON O. NEWMAN, Circuit Judge.

This appeal concerns the authority of a state to discharge an employee in unusual circumstances. The employee, alleged to have held a policy-making position, making him vulnerable to discharge because of political affiliation, contends that he was unlawfully fired, not because of his political affiliation, but in retaliation for a lawsuit filed against state officials by his wife. Alan Adler, a former Deputy Counsel in the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD"), appeals from the June 23, 1998, judgment of the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., District Judge) granting summary judgment to the defendant state officials,[1] dismissing his federal First Amendment claims, and declining to exercise jurisdiction over his pendent state law claims. The District Court ruled that, as a policy-maker, Adler had no First Amendment protection against termination solely because of his political affiliation, and that, to the extent that his claim was based on the state officials' alleged mixed motives—his political affiliation and his wife's litigation against the state, this claim was foreclosed by our decision in *McEvoy v. Spencer*, 124 F.3d 92 (2d Cir.1997).

We reach the following conclusions. First, in disagreement with the decision of the District Court, we conclude that Adler can proceed with his claim that he was fired solely in retaliation for his wife's lawsuit, and not at all for reasons of political patronage. Second, we conclude that Adler qualifies as a policy-maker, and the defendants will therefore prevail in this action if they can ultimately demonstrate that he was in fact fired solely for reasons of political patronage. Finally, to the extent that the defendants acted with a mixed motive, *i.e.*, if they fired the plaintiff both in retaliation for his wife's activities and for reasons of political patronage, we conclude that *McEvoy* does not control and that the defendants will bear the burden of demonstrating that they would have removed the plaintiff from his position even if his wife had not been involved in litigation against the State. We therefore reverse and remand.

## Background

### A. Factual History

From 1981 until December 6, 1996, Adler held the position of deputy counsel for litigation at OMRDD. This position is one of the three associate counsel positions serving directly under the general counsel of OMRDD. In 1996, Adler's annual salary was $90,600. It is undisputed that

---

1. The defendants in this action are New York Governor George Pataki; OMRDD Commissioner Thomas A. Maul; Michael Finnegan, Counsel to the Governor; James Natoli, Director of State Operations; Thomas F. Doherty, Appointments Secretary; Attorney General Dennis C. Vacco; First Assistant Attorney General William Flynn; and Deputy Attorney General Donald P. Berens (the "State"). Adler sued each defendant in his individual and official capacities.

Adler's work performance was satisfactory or better. Politically, Adler characterizes himself as an Independent with Republican ties.

As an associate counsel in the OMRDD, Adler's duties included: (i) formulating the agency's response to all federal and state litigation, (ii) supervising litigation in federal and state courts, (iii) representing the agency in administrative and interdepartmental proceedings, (iv) serving as trial counsel in cooperation with the Attorney General's office, (v) providing general legal advice to senior staff on litigation-related issues, (vi) reviewing judicial decisions and recommending appeal where appropriate, and (vii) identifying agency policy affected by litigation and recommending action or solutions to problems. Adler's position is classified by the State as exempt from civil service protection. In February 1993, OMRDD notified Adler that his position was a "policy-making position" under guidelines issued pursuant to the New York Public Officers Law.

Between November 29 and December 9, 1996, six high-ranking OMRDD employees, including Adler, were discharged. Adler was told that the decision to terminate his employment was not made by his supervisors at OMRDD, but by the Governor's office. All three of the attorneys working as associate counsel in the OMRDD were terminated. On December 2, 1996—four days before Adler was terminated—the general counsel of OMRDD, Paul R. Kietzman, sent a memorandum to his staff, stating: "Please be aware, to the extent it makes any of us feel any better, that all Counsel staff persons who are being separated at this point have been spoken to. I don't have or expect any further information." Adler's eventual replacement—Richard Wolfe, a registered Democrat—was not identified until after Adler's termination.

Prior to October 1995, Adler's wife, Sue, worked as a New York State assistant attorney general in the Albany Litigation Bureau. In December 1995, a year before Adler's discharge, Sue Adler commenced a wrongful termination action against the Attorney General's office, alleging that she was fired because she was not a Republican. She also claimed that her firing was partly in retaliation for her representation of Meredith Savitt in another wrongful termination action based on similar allegations against the Attorney General. On or about March 6, 1996, Sue Adler met with Assistant Attorney General Belinda Wagner, defense counsel for the Attorney General's office in the *Sue Adler/Savitt* cases. During that meeting, Sue Adler said to Wagner, "You know my husband," and reminded her that Wagner and Alan Adler had worked together on OMRDD litigation. Wagner reported this conversation to her superiors, who allegedly perceived a potential for disclosure of confidential information. Kietzman, the General Counsel of OMRDD, was notified of these concerns. When Kietzman spoke to Alan Adler, Adler assured him that he would maintain OMRDD's confidences. In the last week of November 1996, about a week before Alan Adler's termination, a New York state court ordered three lawyers defending Sue Adler's lawsuit, including the former state attorney general, to pay sanctions to Sue Adler and another attorney in the course of their litigation.

### B. District Court's Decision

Two days after his termination, Alan Adler filed this action, alleging that he had been wrongfully discharged; he sought reinstatement and damages. Adler alleged that the defendants violated his First Amendment rights of freedom of expression and association by retaliating against him both because he did not share the same political philosophy as Governor Pataki and because his wife had brought a lawsuit against the Attorney General. In addition, he brought several pendent state law claims.[2] Adler sought a preliminary

---

**2.** Adler brought state law claims for (i) intentional infliction of emotional distress, (ii) vio-

injunction directing his reinstatement. The District Court denied his motion, finding that Adler had failed to demonstrate that he was likely to succeed on the merits.

Prior to discovery, the defendants filed a motion for summary judgment. Adler opposed the motion, arguing both that it failed on the merits and that he should be allowed to conduct discovery. The District Court granted the defendants' motion, ruling that Adler's position at the OMRDD was a "policy-making position" and, therefore, outside the purview of the First Amendment's prohibition against patronage dismissals. This ruling disposed of Adler's retaliation claim based on his political affiliation.

The District Court then considered Adler's "mixed motive" claim that he was dismissed in part in retaliation for his wife's litigation activities. The District Court noted that this Court had held in *McEvoy*, 124 F.3d at 101, that where a public employer's dismissal of a policy-making employee is motivated in part by the employee's political affiliation and in part by the employee's exercise of his First Amendment right to speak out on controversial matters, the employer is nevertheless insulated from liability. Relying on *McEvoy*, the District Court held that "even if the Defendant[s'] termination of the Plaintiff was based on his political affiliation *and* his wife's exercise of her First Amendment rights to bring a suit against the State, the Plaintiff has still failed to state a claim for First Amendment retaliation." *Adler v. Pataki*, No. 96–CV–1950, 1998 WL 326748, at *3 (N.D.N.Y. June 19, 1998) (emphasis in original). The District Court further noted that "even assuming arguendo that the only reason for the Plaintiff's termination was his wife's lawsuit, the individual Defendants would still be entitled to qualified immunity in their individual capacities based on the holding of *McEvoy*." *Id.* n.

6. Having dismissed Adler's federal claims, the Court declined to exercise jurisdiction over his pendent state law claims. Accordingly, the District Court granted summary judgment to the defendants.

## Discussion

### I. Plaintiff's Retaliation Claim

As this case has moved from the District Court to this Court, Adler's contentions have changed. In his complaint, Adler alleged that he was discharged both because he did not share Governor Pataki's political philosophy and because the defendants were motivated to retaliate against him as a result of his wife's lawsuit. On appeal, Adler has abandoned the first claim; indeed, he argues that he submitted evidence, in opposition to defendants' summary judgment motion, from which a jury could find that he was *not* terminated because of his political affiliation. Although he does not concede that he held a policy-making position in which his political views would render him vulnerable to discharge, he is not contending that his political views motivated his discharge. Instead, he contends that the discharge was motivated solely as a retaliation for his wife's lawsuit, and he argues that a genuine issue of material fact exists as to whether this motivation was the sole basis for his termination. He argues in this Court that the District Court erred by considering his allegation of retaliation based on his wife's lawsuit under the rubric of "mixed motive." He also argues that the District Court misconstrued his argument as asserting that his termination infringed his wife's right to bring a lawsuit, when, in fact, he was arguing that his termination infringed *his* First Amendment right of intimate association because his firing was motivated by the fact that it was his wife who was suing the defendants.

lation of Article I, §§ 8 and 9 of the New York Constitution, (iii) arbitrary and capricious conduct in violation of Article 78 of New York

Civil Practice Law and Rules, and (iv) violation of New York Mental Hygiene Law § 13.19.

These arguments on appeal appear to contradict Adler's initial litigation position before the District Court. As a threshold matter, it is thus necessary for us to consider whether the plaintiff can proceed on the basis of his current claim that retaliation was the sole motivation for his discharge or whether he is bound by his prior allegation of a discharge based on political patronage. If the plaintiff can claim a discharge based solely on retaliation for his wife's lawsuit, we must then determine whether such retaliation is actionable under the First Amendment, and, if so, whether the plaintiff has presented sufficient evidence in support of that claim to withstand summary judgment.

### A. Differences Between the Complaint and the Appeal

▮ Rule 8(e)(2) of the Federal Rules of Civil Procedure permits plaintiffs to "plead two or more statements of a claim, even within the same count, regardless of consistency." *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 95 (2d Cir.1994). "The flexibility afforded by Rule 8(e)(2) is especially appropriate in civil rights cases, in which complex inquiries into the parties' intent may sometimes justify raising multiple, inconsistent claims." *Id.* In his complaint, Adler alleged in separately numbered allegations that he was fired due to political patronage and that he was fired in retaliation for his wife's lawsuit. Although these allegations were not specifically pleaded as "in the alternative," we have ruled that Rule 8(e)(2) offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party as we must do in reviewing orders granting motions to dismiss or for summary judgment. *See MacFarlane v. Grasso*, 696 F.2d 217, 224–25 (2d Cir. 1982); *see also Henry*, 42 F.3d at 94.

Moreover, during the preliminary injunction hearing, which occurred shortly after the filing of the complaint, Adler's attorney twice declared—although not very clearly—that the patronage and retaliation claims were pled in the alternative. Furthermore, in opposition to the state officials' motion for summary judgment, Adler asserted the position now taken on appeal—that his political affiliation played no role in his firing and that the defendants were motivated to fire him solely in retaliation for his wife's litigation.

▮ Under these circumstances, we conclude that Adler is entitled to pursue his retaliation claim as an alternative to his abandoned political patronage claim. *See Henry*, 42 F.3d at 95 ("We must not construe [plaintiff's] first claim as an admission against another alternative or inconsistent claim."); *see also Moriarty v. Larry G. Lewis Funeral Directors Ltd.*, 150 F.3d 773, 777–78 (7th Cir.1998) ("Litigants who must frame their claims before obtaining discovery often find it necessary to conform their theories to the facts as time goes on. . . . Although a superseded pleading sometimes may be offered as evidence, a false step early in a case does not blot out the opportunity to prevail on a claim that is sound factually and legally.") (citations omitted).[3]

### B. Existence of the Right

▮ Adler contends that he was fired because of his wife's lawsuit, an action that

---

3. Nor does Adler's allegation of political motivation create a judicial estoppel that bars him from asserting that his wife's law suit was the sole motivation for his discharge. In this Circuit, judicial estoppel applies only when a tribunal in a prior *separate* proceeding has relied on a party's inconsistent factual representations and rendered a favorable decision. *See Simon v. Safelite Glass Corp.*, 128 F.3d 68, 71–72 (2d Cir.1997) (applying judicial estoppel to employment discrimination claim based on position taken in prior Social Security Administration disability adjudication); *see also AXA Marine & Aviation Insurance (UK) Ltd. v. Seajet Industries Inc.*, 84 F.3d 622, 628 (2d Cir.1996) (applying judicial estoppel analysis to position taken in New York State Supreme Court proceeding). Here, on direct appeal from the District Court's ruling, the doctrine of judicial estoppel does not apply.

he contends violates his First Amendment right of intimate association. The nature and extent of that right is hardly clear, however, and it is therefore necessary to consider the appropriate constitutional framework within which to analyze Adler's claim.

The Supreme Court has recognized a right of association with two distinct components—an individual's right to associate with others in intimate relationships and a right to associate with others for purposes of engaging in activities traditionally protected by the First Amendment, such as speech and other expressive conduct. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984).

The source of the intimate association right has not been authoritatively determined. Language in *Roberts* suggests that this right is a component of the personal liberty protected by the Due Process Clause.[4] *See id.* at 618–19, 104 S.Ct. 3244. However, in *City of Dallas v. Stanglin*, 490 U.S. 19, 109 S.Ct. 1591, 104 L.Ed.2d 18 (1989), the Court cited the First Amendment as "embrac[ing]" a right of association that included the two elements identified in *Roberts*, intimate association and expressive association. *See Stanglin*, 490 U.S. at 23–24, 109 S.Ct. 1591.[5] In *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 237, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990), the Court considered a claimed violation of the "right to freedom of association recognized in *Roberts*" without indicating whether the right was grounded on the First Amendment or the Due Process Clause. In *Lyng v. International Union, UAW*, 485 U.S. 360, 364–66, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), the Court considered under the First Amendment a claimed denial of both associational (family) and expressive

rights. *See generally* Collin O'Connor Udell, *Intimate Association: Resurrecting a Hybrid Right*, 7 Tex. J. Women & L. 231 (1998).

Complicating the inquiry as to the source of the right of intimate association is the fact that whenever the Supreme Court has considered an impairment of the most fundamental of intimate relationships, marriage, it has not spoken generally of a right of intimate association, but has referred specifically to a right to marry and has grounded that right on the liberty protected by the Due Process Clause, *see Cleveland Board of Education v. LaFleur*, 414 U.S. 632, 639, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974) ("[P]ersonal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause."); *Loving v. Virginia*, 388 U.S. 1, 12, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) ("These [anti-miscegenation] statutes also deprive the Lovings of liberty without due process of law in violation of the Due Process Clause of the Fourteenth Amendment. The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."), or on a right of privacy protected by that Clause, *see Paul v. Davis*, 424 U.S. 693, 713, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) ("[T]he personal rights found in this guarantee of personal privacy must be limited to those which are 'fundamental' .... matters relating to marriage ...."), or on both liberty and privacy, *see Zablocki v. Redhail*, 434 U.S. 374, 383–85, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) ("[T]he Court recognized that the right to marry .... is a central part of the liberty protected by the Due Process Clause.... More recent decisions have established that the right to marry is part of the fundamental 'right of

---

**4.** *Roberts* grounds the right of association for expressive purposes on the First Amendment. *See Roberts*, 468 U.S. at 618, 104 S.Ct. 3244.

**5.** A concurring opinion in *Stanglin* grounded the associational right "to make friends and enjoy the company of other people" on the

substantive due process component of the Fourteenth Amendment, and explicitly rejected the First Amendment as a source of this right. *See Stanglin*, 490 U.S. at 28, 109 S.Ct. 1591 (Stevens, J., with whom Blackmun, J., joins, concurring in the judgment).

privacy' implicit in the Fourteenth Amendment's Due Process Clause.") (citations and internal quotation marks omitted). The opinions considering claims that a right to marry was impaired or at least burdened have not referred to the First Amendment. *See, e.g., Califano v. Jobst,* 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977); *Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975).

Two courts of appeals have explicitly considered under the First Amendment a claim that state action unlawfully burdened a marital relationship. *See Singleton v. Cecil,* 133 F.3d 631, 635 (8th Cir.1998) (rejecting claim that discharge of at-will police employee violated his First Amendment right of intimate association where wife plotted to have police chief arrested), *aff'd on this point,* 176 F.3d 419, 423–24 (8th Cir.1999) (in banc); *Adkins v. Board of Education,* 982 F.2d 952, 955–56 (6th Cir.1993) (upholding claim that denial of continued employment because of school superintendent's dislike of employee's husband violated her First Amendment right of intimate association); *cf. Shahar v. Bowers,* 114 F.3d 1097, 1110 (11th Cir. 1997) (in banc) (rejecting claim that withdrawal of job offer for position of state prosecutor because of her same-sex "wedding" violated her First Amendment right of intimate association).

The courts' varying doctrinal analyses of claims alleging burdens on marital relationships might stem from the fact that some of these claims challenge a broad regulation affecting a class of allegedly burdened spouses and other claims challenge a specific adverse action taken against a particular spouse. Challenges to broad regulatory measures affecting a marriage relationship tend to be considered claims of unlawful classifications and are tested against the Equal Protection Clause, once a court has asserted that the right to marry is a fundamental right protected by the Due Process Clause. *See, e.g., Zablocki,* 434 U.S. at 383–91, 98 S.Ct. 673 (invalidating statute prohibiting mar-

riage without court approval by members of class under court order to support minor child not in parent's custody); *Loving,* 388 U.S. at 12, 87 S.Ct. 1817 (invalidating statute prohibiting interracial marriage). On the other hand, claims that some adverse state action burdens an individual's marital relationship have been assessed under a First Amendment doctrine of intimate marital association. *See, e.g., Singleton,* 133 F.3d at 635 (rejecting claim of unlawful discharge from employment); *Adkins,* 982 F.2d at 955–56 (upholding claim of unlawful denial of employment opportunity). The willingness to consider individual claims under a First Amendment analysis might be due to courts' recognition of such claims as asserting the sort of retaliatory action that is often tested against the First Amendment whenever adverse action is alleged to have been taken for exercise of any of the freedoms protected by the First Amendment. *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 598, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (teacher claiming contract not renewed "in retaliation for his exercise of the constitutional right of free speech").

Just as the source of a right of intimate association has varied, so has the standard applied in determining whether that right has been violated. Sometimes court opinions suggest that an intimate association right is not violated unless the challenged action has the likely effect of ending the protected relationship, *see, e.g., Lyng,* 485 U.S. at 364–66, 108 S.Ct. 1184 (challenge to provision rendering family of striker ineligible for food stamps rejected because of unlikelihood that it would prevent families from dining together), or unless affecting the relationship was the purpose of the challenged regulation, *see, e.g., Jobst,* 434 U.S. at 54, 98 S.Ct. 95 (challenge to provision terminating disability benefits to secondary beneficiary upon marriage rejected because it was not "an attempt to interfere with the individual's freedom to make a decision as important as marriage") (footnote omitted). In other cases, the opinions

consider whether the challenged action alleged to burden an intimate association is arbitrary or an " 'undue intrusion' by the state into the marriage relationship." *Adkins,* 982 F.2d at 956 (quoting *Roberts,* 468 U.S. at 618, 104 S.Ct. 3244).

█ Though the matter is not free from doubt, we think a spouse's claim that adverse action was taken solely against that spouse in retaliation for conduct of the other spouse should be analyzed as a claimed violation of a First Amendment right of intimate association. New York has not purported to regulate Adler's right to decide whom to marry, a regulation that would clearly require assessment under the substantive due process component of the Fourteenth Amendment. *See Zablocki,* 434 U.S. at 384, 98 S.Ct. 673. Nor has New York endeavored to end a marriage relationship already begun. On the contrary, the New York action challenged here fully accepts the continued existence of Adler's marriage but, according to his claim, seeks to penalize him with loss of his job because of its displeasure with the conduct of his wife. If the First Amendment accords an individual some right to maintain an intimate marital relationship free of undue state interference, Adler's claim properly invokes the protection of that Amendment. His claim is grounded on the most intimate of relationships, marriage, and warrants an appropriately high degree of protection. *Cf. FW/PBS,* 493 U.S. at 237, 110 S.Ct. 596 (rejecting intimate association claim based on brief motel encounters).

We need not decide in this case whether in some circumstances the conduct, or even the identity, of a wife might raise such serious concerns about her husband's suitability for public employment as to justify the husband's discharge (or the discharge of an employee wife because of the identity or conduct of her husband). *Cf. Wilson v. Taylor,* 733 F.2d 1539 (11th Cir.

1984) (noting but not resolving issue of whether police department could fire police officer for dating daughter of organized crime figure). The law has substantially progressed since the days when Mr. Bumble's solicitor informed him that "the law supposes that your wife acts under your direction." [6] For purposes of this case, we need only rule that the activity of Adler's wife in suing state officials for herself and another plaintiff because of employment discrimination in her department could not reasonably be found to justify his discharge. Wherever the line might be drawn that separates a state's permissible and impermissible actions against an employee based on a spouse's conduct, Adler's discharge because of his wife's lawsuit is well across the line. A relationship as important as marriage cannot be penalized for something as insubstantial as a public employer's discomfort about a discrimination lawsuit brought by an employee's spouse.

██ We recognize that in cases where a public employee is discharged because of the allegedly disruptive effect of his own, normally protected speech, courts are required to seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *Cf. Shawgo v. Spradlin,* 701 F.2d 470, 482–83 (5th Cir.1983) (upholding authority of police department to discipline male and female officers for dating and alleged cohabitation). Whatever degree of state interest might be required to overcome a public employee's interest in maintaining a First Amendment right of intimate association despite the employer's concern about some action of the employee's spouse, no *Pickering*-type

---

**6.** *See* Charles Dickens, *Oliver Twist* 520 (Dodd, Mead & Co.1941) (1838). It was this advice that prompted Mr. Bumble to make his well known reply (frequently quoted without regard to the context): "If the law supposes that, ... the law is a ass—a idiot."

balance is required in this case for two reasons.

First, the defendants maintain that Adler's supervisors were not aware of his wife's lawsuit and that Adler was fired solely for reasons of political patronage. By proceeding in this way, the defendants disavow any suggestion that Adler was dismissed on the basis that his wife's activity disrupted office operations. As framed by the parties, then, this case presents no need to balance the importance of Adler's right of intimate association with his wife against any disruption in Adler's workplace created by that association. Rather, this case hinges on a more discrete dispute as to the defendants' true motives. If simple vindictiveness against the plaintiff on account of his wife's lawsuit was the defendants' true motive, a First Amendment violation would be established.

Second, even if Adler's supervisors had been aware of his wife's lawsuit and even if a *Pickering*-type balance is appropriate to balance a public employee's right of intimate association against the employer's interest in avoiding disruption attributable to the combination of her lawsuit and his marital relationship with her, it would take a very strong showing of such disruption to tip the balance in the employer's favor. There is nothing in the record to suggest that the lawsuit brought by Adler's wife threatened the proper functioning of OMRDD, where Adler was employed, to a degree sufficient to permit his discharge.

### C. Existence of a Genuine Dispute

■ Based on our ruling that a retaliatory discharge based solely on litigation instituted by one's spouse is actionable under the First Amendment, we must consider the defendants' contention that the plaintiff has not identified sufficient evidence to resist summary judgment rejecting such a claim. In this regard, the plaintiff need only create a genuine factual

dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Adler has accomplished this by a comfortable margin.

Adler has presented substantial evidence that his wife's lawsuit, not his politics, was the basis for his discharge. He demonstrated that her lawsuit was receiving media coverage unfavorable to the Pataki administration. One of his supervisors, in the weeks before his discharge, reportedly mentioned his wife's litigation and the embarrassment it was causing state officials. In that litigation, Adler's wife had won sanctions against state officials shortly before her husband was fired. Moreover, Adler has produced a memo, issued a week before his firing, declaring that there would be no further dismissals within his department. Adler's replacement, unlike Adler, was a Democrat. Also, Adler's replacement was not selected until after he was fired, thereby casting at least some doubt on the defendants' claim that the plaintiff was fired to "make room" for one of the Republican Governor's political allies. Finally, the plaintiff's evidence shows that several other high ranking OMRDD officials were not terminated despite their lack of connections to the Republican Party.

In short, while a finder of fact might ultimately determine that the defendants acted on the basis of a legitimate reason for firing the plaintiff, he has presented ample evidence, at this preliminary stage in the litigation [7], to support his claim that the defendants acted against him solely in retaliation for his wife's litigation activity. Because such retaliation, if it occurred, is actionable under the First Amendment, the decision below must be reversed.

### II. Patronage Dismissal

■ Though Adler is entitled to prove that his wife's lawsuit was the motivation

---

7. Although this action was dismissed on a motion for summary judgment, there has as yet been no discovery between the parties.

for his discharge, the defendants are entitled to resist that claim by arguing that he was fired solely because of his own political views and that a discharge on that ground was permissible because he held a policy-making position. We agree with the District Court that Adler's position as Deputy Counsel for Litigation at OMRDD was exempt from First Amendment protection for dismissal on the basis of political affiliation alone.

■ Although public employees are ordinarily protected by the First Amendment from discharge based on their political affiliation, *see Elrod v. Burns*, 427 U.S. 347, 360, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), this protection does not apply to employees whose public office legitimately requires policy-making decisions that accord with a particular political viewpoint, *see Branti v. Finkel*, 445 U.S. 507, 516, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Relying on *Elrod* and *Branti*, the Second Circuit has identified eight factors "useful in deciding whether a position is one" that qualifies as a policy-making position susceptible to discharge for reasons related to political patronage. *Vezzetti v. Pellegrini*, 22 F.3d 483, 486 (2d Cir.1994) (quoting *Regan v. Boogertman*, 984 F.2d 577, 579–80 (2d Cir.1993)). "These factors include whether the employee (1) is exempt from civil service protection, (2) has some technical competence or expertise, (3) controls others, (4) is authorized to speak in the name of policymakers, (5) is perceived as a policymaker by the public, (6) influences government programs, (7) has contact with elected officials, and (8) is responsive to partisan politics and political leaders." *Id.* In addition, we have recognized that a high salary is "a common characteristic of policymaking positions." *Savage v. Gorski*, 850 F.2d 64, 68 (2d Cir.1988).

Under the criteria set forth in *Vezzetti*, 22 F.3d at 486, the District Court correctly concluded that the nature of Adler's position gave rise to a "rational connection between shared ideology and job performance." *Savage*, 850 F.2d at 68. Most notably, plaintiff's position was exempt from civil service protection; his work as an attorney required "technical expertise"; he admits that he supervised at least two employees; and he concedes that he oversaw a major environmental litigation with potentially serious repercussions for the state government. There is also no disputing that the plaintiff was a highly paid state official with a salary exceeding $90,000 per year. Our conclusion that the plaintiff worked as a state policy-maker, moreover, is consistent with our analyses of politically motivated dismissals of other attorneys employed by or in New York. *See Bavaro v. Pataki*, 130 F.3d 46, 51 (2d Cir.1997) (associate and assistant counsel in New York State Department of Health); *Vona v. County of Niagara*, 119 F.3d 201, 209 (2d Cir.1997) (assistant attorneys in county department of social services); *Gordon v. County of Rockland*, 110 F.3d 886, 892 (2d Cir.1997) (assistant county attorneys). In light of these considerations, the plaintiff qualifies as a policy-maker whom the defendants could properly remove from his position if reasons of political patronage were their motivation.

### III. Mixed Motive Dismissal

For the reasons explained in Section I, *supra*, the plaintiff has sufficient factual support to proceed under the theory that he was retaliated against in violation of his rights under the First Amendment. As explained in Section II, *supra*, the defendants will prevail, however, if a finder of fact ultimately determines that the plaintiff was fired solely for reasons of political patronage. In this section, we consider the legal implications of a factual determination that the plaintiff was fired for a combination of reasons, *i.e.*, because of both his wife's litigation and political patronage.

#### A. Scope of *McEvoy*

■ The District Court properly recognized that a policy-making employee, vulnerable to discharge solely because of

his political affiliation, nonetheless has some constitutional protection against a discharge impermissibly motivated by other factors. As we pointed out in *McEvoy*, 124 F.3d at 102, a policy-maker may not be discharged for such reasons as race, sex, or national origin. In *McEvoy*, we considered whether a policy-maker, vulnerable to discharge because of political affiliation, was protected against a discharge motivated by his exercise of his right of free speech. We ruled that he was not, deeming it anomalous that a policy-maker whose provocative speech arguably interferes with work-place efficiency should enjoy greater protection than a policy-maker who " 'quietly, inoffensively, undemonstratively belongs to the wrong political party.'" *Id.* at 101 (quoting *Wilbur v. Mahan*, 3 F.3d 214, 218 (7th Cir.1993)).

In the pending case, Judge Scullin understood *McEvoy* to remove First Amendment protection for any policy-maker discharged in part for political affiliation whenever the employer's motivation also included any aspect of the employee's First Amendment rights. Though that is a plausible reading of *McEvoy*, we think it goes too far and is not consistent with the rationale of *McEvoy*. *McEvoy* was based on the close relationship between a public employer's justified concern about a policy-making employee's political affiliation and concern about that employee's public expressions. Protection for the policy-maker in *McEvoy* would not only have created the anomaly noted by the Seventh Circuit in *Wilbur*, it would also have obliged courts to make extremely fine distinctions between the threat to the proper functioning of a government office posed by the political affiliation of policy-makers and that posed by their political speeches.

However, where the employer's motivation rests in part on the exercise of First Amendment rights that are not closely related to political affiliation, the rationale of *McEvoy* is inapplicable. Firing someone because of his relationship with his spouse, for instance, is entirely distinct from firing someone because of his party affiliation. The factual complications likely to arise in determining where patronage ends and speech begins are not a concern in the context of a First Amendment claim of intimate association. Adler contends that he was discharged because of his wife's lawsuit. He alleges that the discharge impaired his First Amendment right of intimate association—the protected right to associate with his wife. If he can persuade the trier of such motivation, *McEvoy* would not bar his claim, even though he held a policy-making position.

B. Affirmative Defense of Dual Motivation

██ Even if Adler can prove that his discharge was motivated entirely, as he contends, or even in part as a retaliation for his wife's lawsuit, the State is entitled to present the affirmative defense of dual motivation, *see Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), and seek to persuade the trier of fact that it would have discharged Adler solely for a permissible motive. The dual motivation defense requires the trier to consider, not what the motivation was, but whether the employer would have taken the same adverse action because of an available permissible motive. *See id.* at 287, 97 S.Ct. 568; *Brock v. Casey Truck Sales, Inc.*, 839 F.2d 872, 876–78 (2d Cir. 1988). Thus, in this case, the State is entitled to prove that it would have fired Adler solely because of his political affiliation, or solely because of some other legitimate reason, such as disclosure to his wife of confidential information of his employer, a circumstance vaguely suggested in the State's papers.

IV. Qualified Immunity

██ The District Court noted that "even assuming arguendo that the only reason for the Plaintiff's termination was his wife's lawsuit, the individual Defendants would still be entitled to qualified

immunity in their individual capacities based on the holding of *McEvoy.*" In *McEvoy*, we ruled that the defendant municipal officials were entitled to qualified immunity because it was objectively reasonable to believe that the plaintiff had held a policy-making position and because the contours of the *Elrod/Branti* exception to policy-making government employees' First Amendment protections were not settled. *See* 124 F.3d at 105. We agree with the District Court that the defendants here are entitled to qualified immunity in their individual capacities for substantially the same reasons as those articulated in *McEvoy.* It was objectively reasonable to believe that Adler was a policy-maker, and the right of a government policy-maker to be free from adverse employment action in retaliation for some extraneous occurrence, such as his wife's activities, was not clearly established at the time of Adler's discharge (which, in any event, occurred before our decision in *McEvoy* ). *See Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *McEvoy,* 124 F.3d at 102.

This does not end our inquiry, however. Qualified immunity shields the defendants only from claims for monetary damages and does not bar actions for declaratory or injunctive relief. *See Wood v. Strickland,* 420 U.S. 308, 315 n. 6, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."), *overruled in part on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *American Fire, Theft & Collision Managers, Inc. v. Gillespie,* 932 F.2d 816, 818 (9th Cir.1991). In his complaint, Adler seeks reinstatement to his position with OMRDD as well as declaratory relief. On remand, if Adler ultimately succeeds on the merits of his state and federal claims, the District Court may fashion equitable remedies, including reinstatement, based on its assessment of the equities as they are developed at trial. We note, however, that the claim for declaratory relief may well be rendered moot if the District Court grants Adler's reinstatement claim or other injunctive relief. *Cf. Ashcroft v. Mattis,* 431 U.S. 171, 172, 97 S.Ct. 1739, 52 L.Ed.2d 219 (1977).

### Conclusion

The judgment of the District Court is reversed, and the case remanded for proceedings consistent with this opinion.