**Leicha RICHARDSON-HOLNESS, Plaintiff,**

v.

**Michael A. ALEXANDER, Ainsley Cumberbatch, Antoinette Martin, Defendants.**

**1:13-cv-2761 (NG)**

United States District Court, E.D. New York.

Signed 02/19/2015

Kenechukwu Chudi Okoli, K.C. Okoli, Attorney at Law, New York, NY, for Plaintiff.

Benjamin Fox Tracy, Laura C. Rowntree, Danielle M. Dandrige, New York City Law Department, Lawrence J. Profeta, NYC Corporation Counsel, New York, NY, for Defendants.

1. The facts set forth in this opinion are taken from plaintiff's SAC and, to the extent well-

## OPINION AND ORDER

GERSHON, United States District Judge

Plaintiff Leicha Richardson-Holness brings this action under 42 U.S.C. §§ 1983 and 1985 against New York City Department of Education ("DOE") administrators Michael A. Alexander, Ainsley Cumberbatch, and Antoinette Martin. Plaintiff's Second Amended Complaint ("SAC") asserts claims of sex discrimination, hostile work environment, and conspiracy against all defendants. In addition, plaintiff asserts quid pro quo harassment and First Amendment retaliation claims against Alexander only. Defendants have moved to dismiss the First Amendment and conspiracy claims as to all defendants, as well as the sex discrimination and hostile work environment claims as to defendants Cumberbatch and Martin. Defendants have not moved to dismiss plaintiff's sex discrimination, quid pro quo harassment and hostile work environment claims against Alexander. For reasons that follow, defendants' motion is granted in part and denied in part.

## THE FACTUAL ALLEGATIONS

In February 2008 plaintiff took a probationary teaching position at the School for Human Rights ("SHR") in Brooklyn.[1] She was offered the position by SHR's principal, defendant Michael Alexander. According to plaintiff, who is married, Alexander began harassing her within months of her arrival by complimenting her appearance and, on several occasions, rubbing her shoulder. During the remainder of the school year, plaintiff would frequently observe Alexander staring at her from out-

pleaded, assumed true.

side her classroom, prompting plaintiff to close her door.

The harassment escalated in September 2008, when Alexander summoned plaintiff to a conference room and stated that he knew (from sources untold) that plaintiff did not want to work for him. Alexander told plaintiff, "I did you a favor by hiring you. You owe me a favor." SAC ¶ 18. When plaintiff rose to leave, Alexander unexpectedly followed her to the door and groped her buttocks. Shocked, plaintiff rushed away.

Alexander's behavior continued through September, during which time he frequently complimented plaintiff's figure and made comments—for example, allusions to "incentive pay" and plaintiff's lack of job appreciation—indicating that he was expecting some manner of sexual quid pro quo. Plaintiff consistently rejected Alexander's advances and, eventually, Alexander grew hostile and began castigating plaintiff in front of students and staff. Plaintiff alleges that the stress of these incidents caused her to become ill and that, at some point in October 2008, she was hospitalized for two weeks as a result.

Shortly after plaintiff returned to work, Alexander learned that plaintiff had received an email from Roz German, a DOE superintendent, in which Ms. German expressed an interest in meeting plaintiff (for purposes unspecified in the SAC). Alexander responded by berating plaintiff and screaming that Ms. German was "not [his] fucking boss" and could not "do anything to [him]." *Id.* ¶ 32. During this exchange Alexander threatened to have plaintiff's teaching license revoked for her lack of "appreciation." *Id.*

Plaintiff alleges that Alexander then "conspired with and enlisted the assistance of" defendant Martin, SHR's assistant principal. *Id.* ¶ 34. Specifically, plaintiff asserts that Martin "acted as Alexander's surrogate" by questioning plaintiff's effec-

tiveness as an instructor and giving her "unsatisfactory" performance ratings. *Id.* ¶¶ 34—35, 39. Previously, plaintiff had received "satisfactory" evaluations.

In March 2009, in what plaintiff characterizes, as a continuation of Alexander's retaliatory scheme, Alexander told DOE's Office of the Special Commissioner for Investigation ("Special Commissioner") that he had been contacted by the father of a female student who had complained about an improper relationship with plaintiff. As a result of these allegations, plaintiff was removed from her position and reassigned to what she describes as "the 'rubber room' in Staten Island." *Id.* ¶ 41.

In August 2009, while plaintiff was still on reassignment, the Special Commissioner issued a report concluding that plaintiff had " 'maintained an inappropriate relationship with a 15 year old student which, at a minimum bore the appearance of impropriety.' " *Id.* ¶ 42. Two months later, Alexander issued a disciplinary letter stating that plaintiff had violated several Chancellor's Regulations, including regulations against sexual harassment. Shortly thereafter, plaintiff received a letter dated October 7, 2009 from defendant Cumberbatch, a DOE superintendent who plaintiff identifies as Alexander's "friend." *Id.* ¶ 44. Cumberbatch's letter stated that consideration was being given to discontinuing plaintiff's probationary employment effective November 9, 2009.

Plaintiff responded to Cumberbatch's letter with a letter of her own rebutting the allegations against her. Cumberbatch then issued a revised letter on November 9, 2009, indicating that he was considering whether to both terminate plaintiff's employment and revoke her teaching license effective December 10, 2009. Plaintiff asserts that Cumberbatch revised his letter because he was "acting in concert" with Alexander. *Id.* ¶ 48. In the midst of (or

shortly after) this letter exchange, on an unspecified date in November 2009, plaintiff filed a written complaint to the DOE, alleging that she had been sexually harassed by Alexander. Plaintiff does not allege that defendants were privy to her DOE complaint.

On December 10, 2009, Cumberbatch issued his decision to terminate plaintiff and revoke her teaching license. Plaintiff pursued available grievance processes, but without success. On June 29, 2010, the DOE Chancellor's designee issued a final ruling upholding Cumberbatch's sanctions. This lawsuit ensued.[2]

## DISCUSSION

■ A complaint must be dismissed if it fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). On a motion to dismiss, the court must assume the truth of "well-pleaded factual allegations" and "determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). This plausibility standard cannot be met with "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678. Nor is it sufficient to plead facts showing "the sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Id.* (internal quotation marks omitted). To push a claim across that line, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### A. First Amendment Retaliation Claim

Plaintiff contends that her rejection of Alexander's sexual advances constituted an invocation of First Amendment intimate associational rights, against which Alexander retaliated. The claim is predicated on the same factual allegations underlying plaintiff's sexual discrimination, quid pro quo harassment, and hostile work environment claims, all of which arise under the Equal Protection Clause. Defendants have not moved to dismiss those Equal Protection claims as to Alexander, nor do they dispute that the Constitution prohibits state actors from retaliating against their employees for rejecting unwanted sexual advances. The only question presented by this aspect of their motion is whether the facts alleged in the SAC state a claim under the First Amendment.

For purposes of this motion defendants accept that plaintiff engaged in constitutionally protected associational activity. Defendants contend, however, that plaintiff cannot state a First Amendment claim because her associational conduct (1) did not implicate a matter of "public concern" and (2) flowed from her "official duties." The court rejects these asserted grounds for dismissal, without reaching whether plaintiff's First Amendment claim is viable in all other respects.

### 1. The Right of Intimate Association

■ The Supreme Court has recognized that the freedom of association takes two forms—the right to engage in "expressive association[s]" and the right to "associate with others in intimate relationships." *Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999). The right of expressive association,

**2.** In January or February 2010, prior to the Chancellor's ruling, plaintiff filed discrimination charges in the Equal Employment Opportunity Commission ("EEOC"). Plaintiff has also filed an Article 78 action in Kings County Supreme Court challenging the revocation of her teaching license. The scope and present status of these proceedings is not specified in the parties' submissions.

while not explicitly set forth in the First Amendment, has been deemed essential to preserving First Amendment freedoms of speech, assembly, and petition. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The freedom of intimate association, on the other hand, is of less certain origin. *See Adler*, 185 F.3d at 42. At times the right has been derived from the First Amendment; elsewhere it has been characterized as a liberty interest arising under the Due Process Clause. *See id.* (collecting cases). Complicating matters further, "[j]ust as the source of a right of intimate association has varied, so has the standard applied in determining whether that right has been violated." *Id.* at 43. While the Second Circuit has elaborated on these open questions, it has not adopted a preferred approach. *See id.* at 42–44; *see also Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 57–60 & n. 17 (2d Cir. 2014).

■ The underlying nature of the freedom of intimate association is less controversial than its origin. Whether construed under the First or Fifth Amendments, the freedom of intimate association recognizes that "individuals draw much of their emotional enrichment from close ties with others." *Roberts*, 468 U.S. at 619, 104 S.Ct. 3244; *accord Matusick*, 757 F.3d at 57–58. In protecting "certain kinds of highly personal relationships" from unwanted state interference, the freedom of intimate association "safeguards the ability independently to define one's identity." *Roberts*, 468 U.S. at 618, 619, 104 S.Ct. 3244. Paradigmatic intimate associations "are those that attend the creation and sustenance of a family," including "marriage," "childbirth," the "raising and education of children," and "co-habitation with one's relatives." *Id.* at 619, 104 S.Ct. 3244. While the freedom of intimate association certainly extends beyond these traditional familial relationships, its outer boundaries are ill-defined. *See Matusick*, 757 F.3d at

58 ("[T]he diversity of human relationships necessitate[s] a sliding-scale analysis rather than a bright-line test."); *Talley v. Brentwood Union Free Sch. Dist.*, 728 F.Supp.2d 226, 237 (E.D.N.Y.2010).

Here, plaintiff does not allege membership in any expressive association. Her claim is premised solely on intimate associations—specifically, her freedom as a married woman and citizen not to engage in a sexual relationship with Alexander.

## 2. The Public Concern Requirement Does Not Apply

■ Proceeding on the assumption that plaintiff has sufficiently alleged an impingement on her associational rights, the parties train their arguments on whether plaintiff's associational activity involved matters of public concern. This leads the discussion astray. The so-called "public concern" requirement arises in public-employee litigation involving First Amendment *expression* and *expressive* associations. It can be traced to *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), which held that, while public employees are not stripped of all First Amendment protections, courts must balance their interests as "citizen[s] in commenting upon matters of public concern and the interest of the State, as an employer, in promoting efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. 1731. In subsequent cases, the Court elevated the "public concern" component of *Pickering* balancing to a threshold requirement, such that "to merit *Pickering* balancing, a public employee's speech must touch on a matter of 'public concern.'" *City of San Diego v. Roe*, 543 U.S. 77, 82–83, 125 S.Ct. 521, 160 L.Ed.2d 410 (2004) (quoting *Connick v. Myers*, 461 U.S. 138, 143, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

■ Although the public concern inquiry is indispensable in cases involving

speech and expressive association, courts have not applied it to claims premised on the freedom of intimate association. *See Starling v. Bd. of Cnty. Com'rs*, 602 F.3d 1257, 1261 n.1 (11th Cir.2010) ("The test in the intimate-association context is identical, except the intimate association does not have to be of public concern.").[3] The logic is straightforward: "Intimate associations are by their very nature not public." *Poleo–Keefe*, 2008 WL 3992636, at *6. It would be no small paradox if a plaintiff challenging state incursion into her most intimate relationships were required to show that those relationships were somehow a public concern. Intimate associations are protected precisely because they are "highly personal" and entitled to "constitutional shelter" from public interference. *Roberts*, 468 U.S. at 618, 619, 104 S.Ct. 3244.

Without making any formal pronouncement, the Second Circuit tellingly has never imposed a public concern requirement on the assertion of intimate associational rights. In *Adler*, for example, the plaintiff alleged that his freedom of intimate association was violated when he was terminated by a New York state agency in retaliation for a lawsuit his spouse had filed against state officials. *See* 185 F.3d at 39–40. Construing this claim under the First Amendment, the *Adler* Court questioned whether *Pickering* balancing should even apply and held that, even if it did, nothing in the record could justify the plaintiff's termination. *See id.* at 45. In so holding, the Court of Appeals did not pause to consider whether the plaintiff's associational rights (or even his wife's lawsuit) were a public concern. *See id.* Similarly in *Matusick*, the Court of Appeals concluded that terminating a public employee on account of his interracial betrothal relationship "violated his constitutional right to intimate association." 757 F.3d at 57. The Court did not question whether the betrothal was a public concern.

*Cobb v. Pozzi*, 363 F.3d 89 (2d Cir.2004), addressed by the parties, is not to the contrary. *Cobb* held that the public concern requirement applies to "all forms of First Amendment *expression*, including associational activity." *Id.* at 104 (emphasis in original). It did not suggest that the requirement extended to non-expressive associations. Nor has *Cobb* been so understood. *See Piscottano v. Murphy*, 511 F.3d 247, 273 (2d Cir.2007) (citing *Cobb* and holding that public concern test applies to "First-Amendment freedom-of-expressive-association claim[s]"); *Poleo–Keefe*, 2008 WL 3992636, at *6 (holding, post-*Cobb*, that public concern test does not apply to intimate association claims).[4]

### 3. Plaintiff Acted As a Citizen

■ Defendants next argue that plaintiff's First Amendment claim fails because, in rebuffing Alexander, plaintiff was acting not as a citizen but "in connection with her official duties." Def. Br. at 11. In so arguing, defendants invoke *Garcetti v. Ceballos*, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006), which held that "when public employees make statements pursuant to

---

**3.** *Accord Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir.2005) ("The *Connick/Pickering* test's requirement that the plaintiff's association relate to a matter of public concern is inapplicable to a claim based solely on intimate association."); *Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir.2004) (construing intimate association as a liberty interest analyzed under due process precedents, and not imposing any public concern

requirement); *Poleo–Keefe v. Bergeron*, 2008 WL 3992636, at *6 (D.Vt. Aug. 28, 2008) (no public concern inquiry in intimate association context).

**4.** The court recognizes that plaintiff embraces the public concern test, accepting that she must satisfy it to prevail. The parties' positions on questions of law, however, are not binding on the court.

their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421, 126 S.Ct. 1951.

█ It is doubtful that *Garcetti* has any bearing on claims asserting freedoms of intimate association. *See Matusick,* 757 F.3d at 57–60 (finding violation of intimate association rights in public-employment context without any mention of *Garcetti*). But even if it does, *Garcetti* provides no conceivable basis for dismissal here. Under *Garcetti,* speech is made pursuant to a public employee's official duties if it is "speech that owes its existence to [the] public employee's job responsibilities." 547 U.S. at 421, 126 S.Ct. 1951; *Weintraub v. Bd. of Ed.,* 593 F.3d 196, 201 (2d Cir.2010). Plaintiff here alleges that she resisted Alexander's advances not because it was an official duty to do so, but simply because she had no interest in conducting an extra-marital sexual relationship with her supervisor. SAC ¶ 71 (plaintiff "who has a right to associate with anyone, also has the right to refuse to associate with anyone"). Plaintiff s actions may have been in the best interests of her institution, as the complaint suggests. *See id.* ¶ 72. But it does not follow, even remotely, that plaintiff's actions owed their existence to her official responsibilities. Plaintiff was employed to teach, not to deflect unwelcome sexual misconduct.

## B. § 1985 Conspiracy Claim

Plaintiff's conspiracy claim asserts that defendants, all DOE employees, conspired with one another to deprive plaintiff of constitutional rights. The claim fails as a matter of law under the intra-corporate conspiracy doctrine, as plaintiff now concedes. *See Linder v. City of New York,* 263 F.Supp.2d 585, 591 (E.D.N.Y.2003) (citing *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978)). Plaintiff's conspiracy claim is dismissed with prejudice.

## C. Claims Against Cumberbatch and Martin

With the conspiracy claim dismissed, plaintiff's only remaining claims against Cumberbatch and Martin assert sex discrimination and hostile work environment. Defendants contend that these claims, pleaded under § 1983, should be dismissed because the SAC fails to allege that Cumberbatch and Martin were personally involved in any constitutional violation.

█ Sex-based discrimination and the creation of a hostile work environment are actionable violations of the Equal Protection Clause that can be pursued under § 1983. *See Raspardo v. Carlone,* 770 F.3d 97, 114 (2d Cir.2014). To prevail on such claims, however, the plaintiff must prove the "personal involvement" of the individually named defendants. *Reynolds v. Barrett,* 685 F.3d 193, 204 (2d Cir.2012). This entails a showing, among other things, that each defendant acted "with discriminatory purpose." *Id.; accord Raspardo,* 770 F.3d at 120, 125. Purposeful discrimination "involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Iqbal,* 556 U.S. at 676–77, 129 S.Ct. 1937 (internal quotation and bracket marks omitted).

Importantly, plaintiff here does not contend that Cumberbatch or Martin participated, either directly or indirectly, in the sexual harassment that underlies her claims. Alexander is the sole alleged harasser. What plaintiff alleges is that, after she rejected Alexander's advances, Alexander used Cumberbatch and Martin to retaliate. Martin allegedly participated by issuing plaintiff unsatisfactory performance evaluations. *See* SAC ¶¶ 34–35. Cumberbatch, in turn, dealt the fatal blow by terminating

plaintiff's employment and revoking her teaching license (after issuing several letters regarding these potential sanctions). *See id.* ¶¶ 44—49.

 As an initial matter, plaintiff's efforts to entangle Cumberbatch and Martin in a retaliatory scheme proceeds on utterly conclusory allegations. As to Martin, plaintiff simply asserts that she "acted as Alexander's surrogate in Alexander's harassment and hostile treatment of [plaintiff]." *Id.* ¶ 34. The allegations against Cumberbatch are similarly undeveloped: "Upon information and belief, Cumberbatch and Alexander are friends, and were acting in concert." *Id.* ¶ 44; *see also id.* ¶ 48 (plaintiff "believes that the reason for [Cumberbatch's] revised letter . . . was . . . Alexander acting in concert with Cumberbatch"). Naked assertions of this sort, pleaded without factual adornment, are not entitled to a presumption of truth. *See Iqbal,* 556 U.S. at 680–81, 129 S.Ct. 1937 (rejecting as too conclusory allegations that "Ashcroft was the 'principal architect' of this invidious policy" and "Mueller was 'instrumental' in adopting and executing it"); *see also JBCHoldings NY, LLC v. Pakter,* 931 F.Supp.2d 514, 527 (S.D.N.Y.2013) (Although *Twombly* did not eradicate "information and belief" pleading, "such allegations must be accompanied by a statement of the facts upon which the belief is founded" (internal quotation marks omitted).).

Even if plaintiff plausibly had alleged that Cumberbatch and Martin acted at Alexander's direction, fatally absent from the SAC is any allegation that these defendants acted with a discriminatory purpose. There is, for example, no allegation that Cumberbatch or Martin harbored discriminatory animus toward plaintiff, nor facts from which such animus could be inferred. Plaintiff does not allege that these defendants were aware of Alexander's retaliatory agenda. Moreover, Martin's unsatisfactory evaluations of plaintiff,

and Cumberbatch's first (and perhaps second) letter, occurred before plaintiff had even complained to DOE regarding Alexander's conduct. Plaintiff does not allege that Cumberbatch or Martin were at any point notified of her complaint to DOE, or assert facts that might support such an inference.

 Instead, plaintiff seems to be relying on the theory that Cumberbatch and Martin can be held liable as unwitting participants in Alexander's plot. *See* Pl. Br. at 3–4. Plaintiff is mistaken. Discriminatory purpose, nowhere alleged as to Cumberbatch and Martin, is essential to imposing liability under § 1983. *See Reynolds,* 685 F.3d at 204; *see also Velez v. Levy,* 401 F.3d 75, 98–99 (2d Cir.2005) (affirming dismissal of claims against officials whose "botched" investigations played a role in retaliatory discharge but who were not alleged to have held any "animus towards [plaintiff]"); *Graham v. Mahmood,* 2008 WL 1849167, at *8 (S.D.N.Y. Apr. 22, 2008) (defendant not "personally involved" in alleged discrimination if only allegation is that the defendant was "used" by another "to effectuate his retaliatory scheme").

All claims against Cumberbatch and Martin are dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss plaintiff's First Amendment claim is DENIED. Defendants' motion to dismiss plaintiff's conspiracy claim and all remaining claims against Cumberbatch and Martin is GRANTED.

**SO ORDERED.**