193 F.Supp.2d 611 (2002)
Melanie SACAY, Plaintiff,
v.
THE RESEARCH FOUNDATION OF THE CITY UNIVERSITY OF NEW YORK; the City University of New York; Brooklyn College; Christine Persico, individually and in her capacity as Assistant Dean for Brooklyn College; and Mary Rose Morris, individually and in her capacity as Director of the Office of Adult and Continuing Education at Brooklyn College, Defendants.
Valerie Sacay, Plaintiff,
v.
The Research Foundation of the City University of New York; the City University of New York; Brooklyn College; Christine Persico, individually and in her capacity as Assistant Dean for Brooklyn College; and Mary Rose Morris, individually and in her capacity as Director of the Office of Adult and Continuing Education at Brooklyn College, Defendants.
No. 97-CV-4002(NG), 97-CV-4006(NG).
United States District Court, E.D. New York.
March 27, 2002.
*612 *613 *614 Rebecca Northey New York, NY, for plaintiff.
James O'Brien, Joel Graber, New York, NY, for defendant.

OPINION AND ORDER
GERSHON, District Judge.
Valerie Sacay and her daughter Melanie Sacay bring these separate actions against *615 the Research Foundation of the City University of New York ("Research Foundation"), the City University of New York ("CUNY"), Brooklyn College, Assistant Dean for Brooklyn College Christine Persico, and Director of the Office of Adult and Continuing Education at Brooklyn College Mary Rose Morris for discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112, 12117; the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq.; New York State Human Rights Law ("NYSHRL"), Executive Law § 296 et. seq.; New York City Human Rights Law ("NYCHRL"), Administrative Code of the City of New York § 8-107; and 42 U.S.C. § 1983 for violations of the First, Fifth and Fourteenth Amendments to the Constitution. Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56 on all of both plaintiffs' claims.

FACTS
Unless otherwise indicated, the following facts are undisputed.

1. Valerie Sacay
a. Employment and Medical History. On May 1, 1989, Christine Persico, Assistant Dean at Brooklyn College, hired Valerie Sacay as an Administrative Assistant in the Office of Adult and Community Education, now known as the Office of Adult and Continuing Education ("BCACE"). BCACE is fiscally administered by the Research Foundation, and Valerie[1] was on the Research Foundation's payroll. The Research Foundation is a not-for-profit corporation that acts as fiscal agent for sponsored programs performed by CUNY. Valerie's primary responsibility was to assist in the design and production of the Audit and Community Education Catalog. On April 16, 1991, Valerie was promoted to Grant Assistant Administrator, which entailed the additional responsibilities of developing and upgrading a computerized registration program. On July 2, 1994, Valerie was promoted to Research Assistant B. In addition to her previous responsibilities, Valerie had to create and manage new databases, including PeopleWare, and supervise data entry personnel. Valerie received recognition for her achievement.
Valerie claims that, when she began working for BCACE, she had a number of physical impairments. She had complex partial seizure disorder, which required her to avoid exhaustion and prevented her from taking the subway or other transportation which creates a "strobing effect." As a result, she quit her job in Manhattan to work closer to home in Brooklyn. Valerie also claims she had back problems and poor vision, which prevented her from reading out of one eye and made her susceptible to eye strain. Valerie's back and neck condition worsened while working at BCACE. From April 12, 1991 to April 23, 1991, Valerie was out on sick leave for chest pain, which was later diagnosed as a gall bladder attack. On January 30, 1992, Valerie suffered a post-surgical mycardial infarction and was required to recuperate at home for eight weeks. By March 1995, Valerie had developed severe gastritis, and was diagnosed with irritable bowel syndrome, an ulcer, and a hiatus hernia.
Valerie claims that by 1994, she "could not take public transportation; climb more than a few stairs; engage in strenuous physical activities necessitating lifting, pushing, pulling, or carrying; sit for more than an hour without back discomfort; work under high stress; or allow myself to become physically exhausted or sleep deprived." *616 She further claims that, although she did not claim to be disabled, she discussed all her conditions, except epilepsy, and the limitations these conditions caused, with Persico. In response, Valerie claims Persico made several accommodations for her, even though Valerie did not specifically ask for an "accommodation." Valerie claims that, even though other employees had non-glare screens, she was the only employee with a "special screen." She also claims she had a more supportive desk chair than other employees. Following her 1992 heart attack, and upon Valerie's request, Persico provided Valerie with computer equipment at home. Valerie claims this was done for defendants' benefit so she could work at home.
Following her return to work, Valerie continued to performed some of her catalog duties from home, but she was generally in the office every day from 11:00 a.m. to 7:00 p.m., except for the last two weeks before catalog production. Valerie indicated that "our office was so crowded that you couldn't think or breath or anything. It was extremely noisy and crowded.... [W]hen this catalog production thing got compressed and crunchier and involved, you knowseventeen hoursthings are much easier to do if you are at home because if you are at home, you can stop and you can lay down and take fifteen minutes and just go breathe." Working at home was typical. According to Persico, "[a]ll the part-time professionals did their work from home unless they were at the campus supervising a class and hiring. Mostly people worked at home."
At a November 11, 1994 meeting, Valerie indicated to Persico and Mary Rose Morris, the Director of the Office of Adult and Continuing Education Program at Brooklyn College, that she could not continue to perform both her catalog and database duties and asked to be relieved from her catalog duties because she was "burned out." After Morris announced that the catalog would be outsourced at a November 28, 1994 staff meeting, Valerie wrote in a December 28, 1994 memorandum that "[n]ow that I've just been relieved of the catalog, I can finally get cracking and hope to proceed with gusto on PeopleWare!" While it is undisputed that the Research Foundation decided to outsource the catalog sometime in November, Valerie and the Research Foundation got into a dispute over Valerie's responsibilities in outsourcing the catalog. During this dispute, Valerie reiterated that she could not perform her catalog duties due to her stress, stating in a February 10, 1995 memorandum that:
Over time, my job had grown significantly into a whole other entity which no one could have possibly foreseen. I have never requested or been unwilling to accept all the additional work and responsibilities that have piled on over the past five years: and I have been successfully handling and fulfilling all of the ever-expanding functions that had been asked of me. However, there were long-run consequences that were detrimental and cumulative: the point has been reached where I could not, safely or reasonably, continue effectively at this pace. Catalog production, which requires intense concentration and unending sessions on the computer, was literally "swallowing my life," exacerbating existing health problems and triggering new ones.... The stress level passed "burn-out" months ago.
Defendants' Exhibit T, 2 (emphasis in original). At her deposition, Valerie testified that she was seeking to be relieved from her catalog responsibilities only, and that she did not want to be released from any other function or seek any other accommodation in this memorandum.
*617 On November 29, 1994, Persico approved the renewal of Valerie's contract for another six months, until June 30, 1995. The Personnel Action Form indicates that "Ms. Sacay is expected to be reappointed on 7/1/95. Benefits should be continuous." In mid-December 1994, Valerie was absent from work due to pharyngitis and otitis media (inflamation of the middle ear cavity). Valerie was out on sick leave again from January 2, 1995 to May 1, 1995 with bronchitis and pneumonia, which she claims was unrelated to her disability. In February, she was treated for "multiple bouts of abdominal pain and multiple movements of diarrhea," which were "exacerbated by stress and anxiety," received counseling for stress, and physical therapy for "severe cervical and lumbosacral radiculitis." Valerie submits medical documentation indicating that, on February 16, 1995 she was treated for irritable bowel syndrome. She was treated for irritable bowel syndrome and hypertension again on March 13, 1995, but her treating physician indicated that the irritable bowel syndrome was improving with rest and medication. On March 14, 1995 and March 20, 1995, Valerie was treated for hypertension and chest pain. On March 29, 1995, Valerie underwent an endoscopy and was diagnosed with an acute peptic ulcer, acute gastritis, and a hiatus hernia. While Valerie was out, her database duties were assigned to another employee, and catalog production was outsourced. However, there was no need to transfer her duties to setup the database because Valerie had already completed this task.
In a letter dated June 15, 1995, after Valerie had been terminated (see discussion to follow), Valerie's treating physician, Dr. Yonk, opined that Valerie has a medical condition that affects her life activities in significant ways. He identified her condition as partial epilepsy since 1986, postoperative non-Q-wave myocardial infarction since 1992; degenerative disc disease since 1993, and duodenal ulcer with gastritis since March 29, 1995. Dr. Yonk noted that these conditions limit her life activities because she needs to be near a bathroom, work close to home, attend regular physical therapy, and work on a flexible work schedule to provide rest periods and time for treatment. He also notes that Valerie should avoid climbing long flights of stairs and avoid the "strobe light" effect of rapid transit. Dr. Yonk concluded that Valerie:
has certain disabilities which are permanent and others which are chronic "exacerbating-remitting" condition.... I previously advised that she could resume her former duties, and I still feel that, with the same accommodations formerly provided to her, this patient is employable and productive. She has advised me that her position is being terminated following her recent illness, and she was not allowed to return to work (on May 1) for the balance of her appointment. This is neither fair nor reasonable nor is it medically indicated.
Valerie Exhibit 18.
In a separate letter dated June 15, 1995, Dr. Norman Sobol, of Neurology Associates, indicates that he saw Valerie on April 27, 1995 for a neurological evaluation. An MRI from 1992 showed mild to moderate herniation of the C3-C4 nucleus pulposus, and significant impingement of the right neuroforamental C5-C6. Valerie subsequently developed sciatica, and an MRI in 1994 showed a small herniated L1-L2 disc but no large pathology. Dr. Sobol notes a subjective loss of sensation over the right anterior portion of Valerie's thigh, and multiple trigger points in the neck and lower back. Dr. Sobol also notes that Dr. Zuckerman has diagnosed Valerie with temporal lobe seizures, and that Valerie has chronic long term compensated myo-fascial pain syndrome. As for treatment, *618 Dr. Sobol notes that Valerie receives physical therapy for her neck and back which has been:
keeping her sufficiently pain free so that she can function in her activities of daily living. Though she has been disabled with these various complaints, she has been able to maintain a reasonable work life and daily regime of living by having flexible work hours for periods of time and work at home.... With continued physical therapy I think she will be able to maintain a reasonable and functional lifestyle. Of course, certain compromises need to be made at her work to accomplish this. However, I do not see why this lady cannot continue working when the choice is mere compromise of style. I would suggest that the patient can continue working; she wishes to work and with a minimal amount of compromise for her special needs, I think she can continue to work.
Valerie Exhibit 18.
b. Valerie's Complaints and Termination. On January 4, 1995, while Valerie was out on sick leave, she spoke over the telephone with Morris. Morris told Valerie that Valerie had to attend a coordinators' meeting regarding the catalog at 10:00 a.m. on January 9, 1995, and that Valerie would have to reschedule her regular physical therapy appointment. Valerie called Michelle Aluqdah, her assistant, who verified that there was a memorandum on her desk from Morris asking her to reschedule her physical therapy appointment for the meeting. Valerie was upset, and called Diana Murphy, the Assistant Director of the Human Resources Department. Valerie testified at her deposition that the purpose of this telephone call was "for information because I feel I am being harassed and I feel that this is happening to me because I was forthcoming with my employers that I was becoming disabled. I don't know if I used `disabled' in the legal sense, the word ...."[2] Murphy agreed to send a copy of the Research Foundation's Project Employee Complaint Procedure to Valerie.
Even though Murphy indicated that the phone conversation would be kept confidential until Valerie filed a written report, Valerie became worried. She called Aluqdah and asked her to hold the memorandum from Morris requesting that Valerie cancel her therapy until Valerie could have the memorandum picked up and stored in a safe place. While Valerie was on the phone, she heard Morris come into her office and ask Aluqdah to find the memorandum and return it to Morris. Valerie called Murphy back to express concern that Morris had found out about her request for information, and Murphy said she would have John Zummo, the Director of Human Resources, call Valerie.
On January 9, 1995, Valerie called Zummo and informed him that she had cause to file a complaint of harassment. She explained the incident with Murphy, and Zummo stated that Murphy assured Zummo that she had not spoken to anyone at Brooklyn College. In response to Valerie's questions about what agency handles claims under the ADA, the following exchange took place:
Zummo: Have you ... you indicated that you have a disability. Have you ever made your disability known?
Plaintiff: No, I'm not ... I never indicated that I have a disability.

*619 Zummo: Oh.
Plaintiff: I ... I never held myself so I could be a disabled person, but I do have physical problems, of which my employer is aware.
Zummo: So we're aware. It's in your personnel folder here ... that you have uh ... that you have a disability and you need a reasonable accommodation.
Plaintiff: No.
Zummo: It isn't? Okay.
Plaintiff: No, it is not.
Zummo: It is not. Okay.
Plaintiff: Um ... there's no reason why it should be.
Zummo: We're the employer. It should be in your file of employment.
Plaintiff: Oh, if I file a complaint, I understand. But I've never filed a complaint.
Zummo: If you complain, then you understand that our [indiscernible] respond and there's no ... there's never been a request for reasonable accommodations. Do you understand that?
Plaintiff: Oh, I understand that. But there's never been an ... an occurrence before where I would have had to make a request for reasonable accommodations. They're ... you know ... the accommodations have always been there and they've always been reasonable up until um ... last week.
Zummo: So then ... so what you're telling me is they removed the accommodations.
Plaintiff: Yes.
Zummo: They removed ... and they agreed ... it was a prior agreement to provide you with reasonable accommodations.
Plaintiff: No it was prior agreement, um ... you know ... I was asked if I could attend a certain meeting, and Iyou knowtold the secretary who was circulating this memo about this meeting ... um ... that it would be very difficult for me to attend the meeting at that time due to a doctor's appointment, but that I'd be happy toyou knowcome at some other time.
* * * * * *
I was called and I was told that I had to be at that meeting ... and that I would have to cancel any doctor's appointments I might have to be present at the meeting....
* * * * * *
But that's just one. I mean there's several others that were ... several other things that happened. But that's just you knowa part of the whole picture.
Defendants' Exhibit CC p. 9-11. At her deposition, Valerie explained that she did not know what the term disabled meant. In a subsequent affidavit Valerie claims that she said she was not disabled because she understood Zummo to be asking whether Valerie had ever filed a formal, written declaration of disability.
On January 20, 1995, Persico called Valerie to arrange for the pick-up of the computer equipment defendants had placed in Valerie's home. Persico explained that they wanted the computer because they needed the computer for someone else. During the conversation, Valerie and Persico discussed Valerie's impairments. Valerie stated that "[m]y physical problem right now is that I can't be very far from my bathroom. I have terrible gastritis. I have terrible colitis and it's all being brought on by stress and I cannot be at work because literally I can't ... I'm under medication and I can't run from the office to the toilet 50 times a day. Alright?" At another point, Valerie indicated that "the main reason I can't be at work is because of the bathroom problem."
On February 5, 1995, BCACE placed a job posting in the New York Times that *620 Valerie claims matched her job-description. This advertisement was for a "Database Assistant Manager (Acting)," which required the applicant to code dBases for registrar and financial activities in a large continuing education program, enter data, and generate outputs. The advertisement stated that the annual salary range was $27,000 to $32,000, and that familiarity with PeopleWare was "a plus." Valerie's salary at the time was approximately $37,000.
On February 9, 1995, Valerie wrote a letter to Zummo stating that she elected "to exercise my employee rights under Research Foundation policy in hopes of settling this matter through your channels." Valerie also expressed concern "that, very shortly after I spoke with your department on January 4th, Director Morris had removed from my desk certain memos [that she had written] which could have substantiated the occurrence of unfair and improper treatment and raised the possibility of an ADA issue." By letter dated February 24, 1995, Zummo stated that he was "stopping the clock" for Valerie to file an internal complaint, and that a meeting would be held when Valerie was well enough to attend. In response, Antonia Kousoulas, Esq., an attorney Valerie had hired, wrote to Zummo on March 17, 1995 indicating that she wanted to discuss the "terms, conditions and timing of the meeting." Zummo replied that the meeting was not a "due process" hearing and that an attorney was not required.
On April 11, 1995, Valerie's attorney notified the Research Foundation that she was authorized to return to work on May 1, 1995. Valerie's attorney claims that she informed Zummo that Valerie would need some accommodations upon her return to work, and the two agreed to discuss the necessary accommodations at an upcoming meeting. In the medical authorization, Dr. Yonk indicated that "I strongly recommend that she not immediately launch into a full-time schedule. I advise no more that [sic] 15 hours the first week, followed by 5 hour increments each succeeding week until she reaches 35 hours. Patient should avoid high stress situations and not work overtime." Valerie's attorney claims that on April 17, 1995, she spoke to Zummo again, alerted him that Valerie wished to return to work, and asked to arrange a meeting to discuss Valerie's duties and accommodations. In a declaration, Valerie claims she needed the accommodation she had received prior to her sick leave, and to work near a bathroom because of her recently diagnosed gastrointestinal disorders.
On April 25, 1995, Zummo informed Valerie's attorney via the telephone that Valerie's position would be "abolished" as of June 30, 1995. Valerie's attorney claims that she responded by requesting that a meeting be held before May 1, 1995. On May 24, 1995, Zummo, Murphy, Bonnie McGrath, Esq., counsel for the Research Foundation, Valerie, and her attorney held a meeting. In a May 30, 1995 letter, Valerie's counsel claimed that at the meeting Valerie was "advised that her position with the Research Foundation had been `retrenched' effective that day, and that there would be no need to discuss her return to work or reasonable accommodations for her disabilities." On May 27, 1995, Valerie received a letter signed by Persico which stated that Valerie's position had not been eliminated on May 24, 1995, but that she had been placed on "administrative leave off campus" until her contract expired on June 30, 1995. In a June 21, 1995 letter, Persico indicated that Valerie's position had been eliminated due to college-wide budget cuts.
BCACE ran an operating deficit of almost $81,000 in fiscal year 1994 (July 1, 1993 to June 30, 1994). This deficit *621 reached almost $147,000 in fiscal year 1995 (July 1, 1994 to June 30, 1995), and was $129,276 in fiscal year 1996 (July 1, 1995 to June 30, 1996). At some time prior to June 30, 1995, Morris expressed concern to Persico and Thomas Hladek, the controller for BCACE, about the deficits, and Persico and Hladek responded that there was nothing to worry about because there was a reserve fund of approximately $500,000, which would cover their expenditures.
In addition to Valerie's position, three full-time positions, and three part-time positions were eliminated in the fiscal year 1995. One of these employees was moved to another department. No one was terminated in the following fiscal year. Further, in a memorandum dated May 30, 1995 to Zummo, Persico, in discussing her desire to terminate Melanie Sacay, Valerie's daughter, states:
I'm anxious to get Melle off our payroll because our fiscal situation is so dire and we do need to replace her. We already eliminated five full-time positions (3 at your recommendation to support our claim that Val's position was eliminated due to budget cuts) in the past 18 months and we're dangerously understaffed.
Northey Dec. Ex. 20 p. 6.
No one was hired to take over Valerie's database duties. Other employees took over this function. One of the employees who assumed database responsibilities testified that he "thinks" the employees were told that they would not receive a raise for assuming the new responsibilities because of Valerie's lawsuit, but that about a year later they did receive a raise. After Valerie left, defendants continued to outsource the catalog. However, a part-time employee, Hilda Feldman, assumed Valerie's responsibilities to supervise the desk-top publishers. Feldman performed this function at home, and was paid $27 or $28 an hour in addition to her salary for the work.

2. Melanie Sacay
On April 20, 1990, approximately eleven months after hiring Valerie, Persico hired her daughter, Melanie Sacay, as a part-time secretary at BCACE. In October 1990, Melanie was appointed to the full-time position of Evening Supervisor and Marketing Assistant at BCACE. Thereafter, she was promoted to the position of Coordinator of various non-certificate courses run by BCACE. For about ten months beginning in 1994, Melanie also performed the majority of the duties of Office Manager at the program. On December 7, 1994, Melanie was again promoted to Assistant Director for Program Operations, because of her "dedication and outstanding job performance." Her salary increased to $40,000, effective January 1, 1995. For purposes of this position, Melanie proposed her own job description. Her duties included training and supervising the support staff; coordinating the staff and registration schedules; coordinating security for the courses; marketing; coordinating BCACE catalog sections with teachers, times, and classrooms; approving course extensions; and scheduling printing time for the catalog.
On May 30, 1995, about a month after Valerie had been informed that she would be terminated, Persico informed Melanie that she was being immediately transferred for a three-month appointment to a BCACE office located at Metrotech Center in downtown Brooklyn. Melanie was not informed what her job responsibilities would be at the Metrotech office. Melanie claims that Persico informed her that this action was being taken because Melanie was "under suspicion and this transfer would remove [her] from accusations that [she] was `doing anything' for [her] mother." *622 Melanie further claims Persico "acknowledged that this is happening because [defendants] are presently engaged in a labor dispute with [Melanie's] mother, and [Persico] characterized the current climate as an `ugly situation ....'" Melanie was told about the transfer while she was at the Metrotech office for a meeting, and she was not allowed to return to the Brooklyn College campus to retrieve her personal items. The office locks were changed, and security was informed to prevent her from entering the Brooklyn College campus.
While Melanie was not informed immediately what her job responsibilities would be, her benefits and hours remained the same. Melanie reported to the Metrotech office for one day, and then requested and was granted annual leave owing to the illness of her grandmother.
On June 5, 1995, Melanie responded to her transfer with a letter referring to her mother's disabilities and stating that "I honor and support her right to pursue whatever course of action is legitimate for her." It is undisputed that this was the first time she communicated with defendants about her mother's health problems. Persico responded by stating that the reassignment was in the best interest of the employer. Melanie replied on June 14, 1995, inquiring whether she would be reappointed on June 30, 1995. On July 6, 1995 Melanie received a letter dated July 5, 1995, stating that there was an offer of reappointment. Since there was no job description in the letter, Melanie sought clarification on July 6, 1995. On July 11, 1995, Persico sent a reappointment letter and a copy of a job description titled "Staff Position for Melanie Sacay." Melanie was to be a staff person assigned to work on the BEGIN Work Study Program and be supervised by Assistant Director Frances Lange. Her job description, which the July 11, 1995 letter claims had been prepared on June 14, 1995, was:
 Assist other staff in the delivery of Orientation & Assessment services to newly referred clients ensuring their successful transition to the project.
 Cooperate with other staff in the planning and implementation of special project events such as picnics, student recognition, training/educational fairs, job fairs, open houses, etc.
 Collaborate with other staff on the publication of student writing, of a project newsletter (monthly), and other written materials that promote positive project concepts internally and externally.
 Assist project staff with the work of job placement, the task of establishing private internship possibilities for clients, liaison contacts with potential employers.
 Perform other duties assigned by Project Director or Assistant Director.
Melanie Exhibit 6-11.
Persico claims that this position was equivalent to Melanie's previous position, but admits that, while Melanie had supervised people as an Assistant Director in her previous position, she would be supervised by an Assistant Director under this new job description. Melanie admits that some of her job responsibilities were similar to her previous position, but she claims that her clientele was different in the BEGIN program. At Brooklyn College, Melanie dealt with adults who voluntarily sought continuing education, but BEGIN was a mandatory program for people receiving public assistance. Further, Melanie claims that her hours were changed from 11:00 a.m. to 7:00 p.m. to 9:00 a.m. to 5:00 p.m. and she would have to work at Metrotech Center, which Melanie claims was an undesirable location because the commute was longer, it was in a more dangerous neighborhood, and she would have to pay for parking.
*623 Melanie refused the offered position on July 21, 1995 in a written memorandum. She stated:
I believe that your offer of a three-month "re-appointment" is bogus. I am declining the option of a forced demotion and relocation (which will add time and parking expenses to my daily commute). I am undeservedly being thrown out of my current position as BCACE Assistant Director, Program Operations for no legitimate reason. In addition, these events and my "disappearance" have created a climate of fear and suspicion in the office. Contributing to this has been the fact that, while I have been on annual leave to help my family during a devastating medical crisis, you and Director Morris have been actively soliciting negative information about me from associates. Given these circumstances, I must decline.
Melanie Exhibit 5. Melanie left BCACE and was subsequently re-hired by the Research Foundation to work on a different program at Hunter College.
On May 30, 1995, Persico began a running memorandum to Zummo regarding Melanie's future with the Research Foundation. On May 30, 1995, Persico inquired whether she could fire Melanie. In the memorandum, Persico states that she would prefer to terminate Melanie rather than transfer her because transfer would make other employees feel uncomfortable and give Melanie the opportunity to "fish at other projects." On June 7, 1995, in the memorandum, Persico states that "[o]ne possibility is that [Melanie] will be so unhappy with her reassignment (she's complaining about the schedule, longer commute, and cost of parking) that she will resign."
In this running memorandum, Persico lists Melanie's performance problems. First, she claims that Melanie was either late for work, left work early, or was absent four times without recording the time off on her time sheet or compensation time record. Persico notes that another employee, Dorothy Craig, had a similar pattern of lateness, but when Persico discussed the matter with her, she no longer was tardy and she fixed her records. Every hour of overtime that an employee worked had to be recorded on a compensation sheet, and then an employee was permitted to take that amount of time off. Employees were not required to record overtime if, during the same week, they took the same amount of time off from their regular schedule. After Morris spoke to Melanie, Persico claims Melanie failed to correct the records. Two co-workers claim that Melanie was an outstanding employee and did not have a lateness or absentee problem. Further, Melanie claims she did not have any conversation with Morris or Persico regarding unrecorded absenteeism or tardiness, and when asked at her deposition whether she had taken unrecorded time off, she responded "if I had to record it, I would have."
Second, Persico claims that Melanie attempted to sabotage the catalog by choosing a color for the summer 1995 catalog that rendered most of the catalogs illegible. Persico claims that the publisher choose green and rose for the catalog, but Melanie suggested blue and yellow. Persico claims she expressed concern that yellow would be illegible, but Melanie assured her that there would be no problem. Nevertheless, when the catalogs, which cost $40,000, arrived, 75% of them were illegible, and BCACE received numerous complaints. The memorandum suggests that, given Melanie's prior satisfactory performance on catalog production, she may have been undermining the catalog because her mother filed a complaint. Melanie claims that she did not participate in the color choice, Morris was in charge of *624 the catalog, and that Morris selected the colors for the catalog.
Third, on June 7, 1995, Persico indicated that she believed Melanie was sabotaging the catalog by engaging in improper activities with vendors. Persico indicates that on June 7, 1995, she received several telephone calls from vendors. One complained that he had not been paid for a bill he had submitted to Melanie in April, and about a threat Melanie had made not to permit the vendor to bid for the next catalog. Another vendor complained about having difficulties obtaining price quotes from Melanie. A third vendor, NEWS, inquired why defendants had not responded to their bid to print the catalog. Persico had asked Melanie to research the possibility of having NEWS print the catalog because colleagues had informed Persico about NEWS's reasonable prices. Melanie informed Persico that NEWS did not offer printing services. When Persico went to Melanie's files, she found a bid from NEWS, dated April 17, 1995, that was the lowest bid that defendants had received.

DISCUSSION

Summary Judgment Standards
Motions for summary judgment are granted if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Lipton v. Nature Co., 71 F.3d 464, 469 (2d Cir.1995). The moving party must demonstrate the absence of any material factual issue genuinely in dispute. Id. The court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, the non-moving party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir.1986). The party must produce specific facts sufficient to establish that there is a genuine factual issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
In a discrimination action such as this, it is important to note that [a] victim of discrimination is ... seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence .... [W]here a defendant's intent and state of mind are placed at issue, summary judgment is ordinarily inappropriate.
Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir.1991) (citations omitted). On the other hand, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985).

Sovereign Immunity
Both Melanie and Valerie Sacay's claims against CUNY, Brooklyn College, and Persico in her official capacity as Assistant Dean for Brooklyn College are barred by the Eleventh Amendment. A state employee may not recover money damages from the State for violations of the ADA, Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356, 360, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001), or of § 504 of the Rehabilitation Act, Garcia v. State University of New York Health Sciences Center of Brooklyn, 280 F.3d 98, 113 (2d Cir.2001), unless the State consents to allow such claims to be brought. Plaintiffs do not claim that the State waived its sovereign immunity. Cf. Campbell v. City University Construction Fund, 1999 WL 435132 *1-*2 (S.D.N.Y. 1999) (holding that the NYSHRL and the *625 NYCHRL do not waive state sovereign immunity).
Citing Pikulin v. City University of New York, 176 F.3d 598, 599-600 (2d Cir. 1999), plaintiffs argue that Brooklyn College and CUNY are not "arms of the state." In Pikulin, the Court of Appeals for the Second Circuit vacated and remanded the dismissal of a discrimination case based on a line of Southern District of New York cases which had found that CUNY is an arm of the State for Eleventh Amendment purposes. The Court of Appeals stated that the "appropriate analysis focuses both on the extent to which the state would be responsible for satisfying any judgment that might be entered against the defendant entity, and on the degree of supervision exercised by the state over the defendant entity," and held that the Southern District cases had not offered a sufficient basis upon which to conclude that CUNY was an arm of the State. Id.
However, Pikulin dealt with a CUNY Community College, while Brooklyn College is a Senior College. Subsequent district court cases that have applied Pikulin's analysis to CUNY Senior Colleges have held that CUNY Senior Colleges are arms of the State for Eleventh Amendment purposes. See Salerno v. City University of New York, 2000 WL 1277324 *3 (S.D.N.Y.2000); Becker v. City University of New York, 94 F.Supp.2d 487, 490 (S.D.N.Y.2000); Hester-Bey v. New York City Technical College, 2000 WL 488484 *4 (E.D.N.Y.2000). Under the first Pikulin step, the State will pay judgments entered against CUNY Senior Colleges, while New York City may pay judgments entered against CUNY Community Colleges. N.Y. Education Law § 6224(1), (6); New York General Municipal Law §§ 50-e, 50-i; Hester-Bey, 2000 WL 488484 *2-*3; Becker, 94 F.Supp.2d at 489. Under the second Pikulin step, the State exercises a great degree of supervision over CUNY Senior Colleges. The State appoints the majority of the members of CUNY's controlling body, including the Chairman and Vice Chairman, the State supervises the budget for CUNY's Senior Colleges; the real property used by CUNY Senior Colleges is owned by the State, and the State authorizes CUNY to acquire property for use by Senior Colleges under the State's eminent domain power. Becker, 94 F.Supp.2d at 490; Hester-Bey, 2000 WL 488484 *3-*4. Therefore, as an arm of the State, Brooklyn College and CUNY are protected from suits for money damages under the ADA, Rehabilitation Act, and state law.
The Research Foundation and Morris do not claim that Eleventh Amendment Sovereign Immunity bars claims against them.

Valerie Sacay's Disability Claim Under the ADA[3]
The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... discharge of employees...." 42 U.S.C. § 12112(a). A plaintiff bringing a claim of discriminatory discharge under the ADA bears the initial burden of establishing *626 a prima facie case of discrimination. To meet this burden, a plaintiff must show that: (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability. Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir.2001).
The ADA describes an individual as suffering from a "disability" if she makes a showing of any one of the following: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). In this case, Valerie relies only on subsection A. "Only a `qualified individual with a disability' may state a claim for discrimination under the ADA;" even if a plaintiff alleges a firing because of a medical condition, she can bring a claim under the ADA only if her medical condition rises to the level of a "disability." Parker v. Sony Pictures Entertainment, Inc., 19 F.Supp.2d 141, 147 (S.D.N.Y.1998), aff'd in part vacated in part 204 F.3d 326 (2d Cir.2000).
The Supreme Court has articulated a three step process for evaluating a claim of "disability" as defined under the ADA. Bragdon v. Abbott, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998). First, the court determines whether the plaintiff suffered from a physical or a mental impairment. Second, the court identifies the life activity indicated by the plaintiff and considers whether it qualified as a "major life activity" under the ADA. Finally, the court determines whether the claimed impairment substantially limited the major life activity. Id. Under this analysis, "a plaintiff who showed that [s]he had an impairment and that the impairment affected a major life activity would nonetheless be ineligible if the limitation of the major life activity was not substantial." Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 641 (2d Cir.1998), cert. denied 526 U.S. 1018, 119 S.Ct. 1253, 143 L.Ed.2d 350 (1999).
Although the ADA does not define "major life activities" or "substantial limit[ation]," the regulations promulgated by the EEOC under the ADA provide guidance in interpreting the ADA. See, e.g., Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 870 (2d Cir.1998); Francis v. City of Meriden, 129 F.3d 281, 283 n. 1 (2d Cir. 1997); see also Toyota Motor Mfg. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 689-90, 151 L.Ed.2d 615 (2002) (assuming without deciding that EEOC regulations are entitled to deference). "Major life activities" are defined under the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). "Substantially limits" is defined as:
(i) unable to perform a major life activity that the average person in the general population can perform; or
(ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.
29 C.F.R. § 1630.2(j)(1).
To be substantially limited in any major life activity, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." Toyota, 122 S.Ct. at 691-92. A plaintiff must do more than submit evidence *627 of a medical diagnosis, she must offer "evidence that the extent of the limitation caused by [the] impairments in terms of [her] own experience is substantial." Id. In making this determination, a court's inquiry is not limited to analyzing the effect of the impairment on the work-place, but a court must determine whether the impairment has a substantial limitation on "an important part of most people's daily lives." Id. at 693-94.
In this case, Valerie has failed to raise a genuine issue of material fact that she is disabled. She has not shown that her impairments substantially limit a major life activity. Applying the three step process established in Bragdon, defendants do not contest that Valerie suffers from impairments. Valerie identifies travel, working, controlling the elimination of waste, and physical activities necessitating lifting, pushing, pulling, carrying, and sitting as major life activities. Travel, as defined by Valerie, is not a major life activity. Valerie claims that she cannot drive an automobile or take public transportation that causes a strobing effect. Driving an automobile is not a major life activity. See Colwell, 158 F.3d at 643. Nor is taking public transportation that causes a strobing effect a major life activity. See Reeves v. Johnson Controls World Services, 140 F.3d 144, 152 (2d Cir.1998) (holding that taking ground transportation along a route which might cause one to cross a bridge or tunnel is not a major life activity). Valerie has not indicated that she cannot take any transportation, or even any public transportation. Indeed, she indicates that she had no problem traveling in Brooklyn, and that it was only traveling into Manhattan that caused her problems. As in Reeves, Valerie improperly narrows the frame of reference and hypothesizes a major life activity based on examples that are co-extensive with her symptoms. Id. at 152-53.
Sitting and lifting have been found to be major life activities by the Court of Appeals for the Second Circuit. Colwell, 158 F.3d at 642. While the Supreme Court has questioned whether work is a major life activity, Sutton v. United Air Lines, Inc., 527 U.S. 471, 491-92, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the Second Circuit, in post-Sutton decisions, has continued to treat work as a major life activity. Heyman v. Queens Village Comm. for Mental Health, 198 F.3d 68, 72-73 (2d Cir.1999); Muller v. Costello, 187 F.3d 298, 312, 312 n. 5 (2d Cir.1999). Finally, this court will assume that the ability to control elimination of waste is a major life activity. Ryan, 135 F.3d at 867 (assuming without deciding that an inability to control the elimination of waste is a major life activity).
Turning to the third Bragdon step, Valerie has failed to show that she was substantially limited in any of these major life activities. Where work is the identified major life activity, the EEOC regulations define "substantially limited" as a:
[s]ignificant restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.
Id. § 1630.2(j)(3); Giordano, 274 F.3d at 747. To be substantially limited in the major life activity of work, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice.... [I]f a host of different types of jobs are available, one is not precluded from a broad range of jobs." Sutton, 527 U.S. at 492, 119 S.Ct. 2139.
Valerie complained to defendants about the stress caused by the catalog *628 production and asked to be relieved from that job function. However, she indicated to defendants that she could continue to perform her database duties, and Valerie testified that she did not want to be released from any other job function besides catalog production. Thus, at most, Valerie has shown that she was substantially limited in her ability to perform a particular job function, catalog production, "[b]ut the inability to satisfy the requirements of a particular assignment does not mean such a person is regarded as handicapped.... To meet that definition, the employee's impairment must limit her employment generally." Heilweil v. Mount Sinai Hospital, 32 F.3d 718, 719 (2d Cir.1994), cert. denied 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995); Manzi v. DiCarlo, 62 F.Supp.2d 780, 792 (E.D.N.Y.1999). Valerie has made no such showing.
On the contrary, the medical evidence submitted by Valerie suggests that her impairments did not substantially limit her employment generally. Dr. Sobol, indicated that, with continued physical therapy, Valerie can function in her activities of daily living. See Sutton, 527 U.S. at 482, 119 S.Ct. 2139 (holding that measures taken to mitigate an impairment must be taken into account when determining whether the impairment is disabling). The only limitation on Valerie's ability to work that Dr. Yonk indicates on Valerie's medical authorization to return to work is that Valerie should increase the number of hours she works incrementally until she begins working full-time, should not work overtime, and should avoid stress.
Assuming Valerie's claims that she cannot climb more than a few stairs or engage in strenuous physical activities necessitating lifting, pushing, pulling, or carrying to be true for purposes of this summary judgment motion, these claims are too vague and qualified to establish that the degree of limitation she suffers is substantial. See Colwell, 158 F.3d at 644 (holding that two employees failed to show substantial limitations where one employee could not sit for "prolonged" periods, lift "very heavy objects," or stand in one particular area for more than an hour, and the other employee had difficulty sitting or standing for "a long period of time" and lifting anything heavy); see also Toyota, 122 S.Ct. at 693 (holding that, in determining whether an impairment substantially limits a major life activity, the focus is on whether the claimant is unable to perform the tasks central to most people's daily lives, not whether she is unable to perform tasks associated with a specific job).
Finally, Valerie has failed to show that she is substantially limited in her ability to eliminate waste. In support of her claim, Valerie cites Mazza v. Bratton, 108 F.Supp.2d 167 (E.D.N.Y.2000), aff'd 2001 WL 363513 (2nd Cir.2001), cert. denied ___ U.S. ___, 122 S.Ct. 199, 151 L.Ed.2d 140 (2001), where this court found that a plaintiff with colitis was substantially limited in his ability to perform the major life activity of eliminating waste. In that case, the plaintiff presented evidence that he experienced numerous bloody bowel movements, about eight a day during severe periods, was dehydrated, and "quite symptomatic." Further, during the months after hospitalization, he experienced severe diarrhea, loose and bloody stool up to ten times a day, inflammation, severe cramps, nausea, gas, bowel urgency, weight loss, loss of appetite, dehydration, fatigue, pain, fever, sexual dysfunction, joint pain and anemia, and hemorrhoids. Plaintiff testified that the symptoms were so bad that he was bedridden at times. Id. at 170.
Mazza recognized that a determination whether a person is substantially limited in her ability to perform a major life function is a fact-specific determination and, unlike *629 in Mazza, there is no evidence that Valerie's colitis was so severe that it substantially limited a major life activity. See id.; see also Toyota, 122 S.Ct. at 693; Ryan, 135 F.3d at 871 (holding that a plaintiff failed to show that she was substantially limited in her ability to control elimination of waste). Valerie's affidavit describing her impairments and how they limit her life activities merely indicates that she was diagnosed with irritable bowel syndrome and that she needs to be near a bathroom. Valerie does not indicate her symptoms or how severe they are; how long the colitis will last; whether she is in pain and if so the frequency and severity of the pain; or how much control she has over her bowel movements, whether she has ever soiled herself, or how many times a day she must use the bathroom.
Valerie stated in a January 20, 1995 telephone conversation with Persico that "I have terrible colitis and it's all being brought on by stress and I cannot be at work because literally I can't ... I'm under medication and I can't run from the office to the toilet 50 times a day. Alright?" However, in a memorandum written after this telephone conversation on February 10, 1995, in which Valerie complained about her health problems, the only accommodation Valerie sought was to be relieved from her catalog duties. Further, this argumentative statement, which she recorded several weeks before there was any medical record of treatment for colitis, cannot substitute for evidence. The medical evidence nowhere suggests that Valerie's colitis was sufficiently severe to substantially limit her major life activities. Dr. Yonk's June 15, 1995 report, which he prepared after Valerie was terminated, indicates that Valerie's life activities are limited by her need to be near a bathroom. However, he does not indicate the severity of her colitis, and merely needing to be near a bathroom is not a limitation that rises to the level of severity, frequency and duration required for a finding of a disability under the ADA. See, e.g., Ryan, 135 F.3d at 871; Sacay v. Research Foundation of the City University of New York, 44 F.Supp.2d 496, 502 n. 1 (E.D.N.Y.1999); Johnson v. New York Medical College, 1997 WL 580708, * 6 (S.D.N.Y.1997); Caporilli v. City of Rome, 1992 WL 209327 (N.D.N.Y.1992). To the contrary, Dr. Yonk's June 15, 1995 report suggests that Valerie's gastritis did not rise to the level of a disability. The report concludes that "with the same accommodations formerly provided to [Valerie], this patient is employable and productive," and it is undisputed that prior to this letter, Valerie did not receive the accommodation of being near a bathroom. Further, Dr. Yonk fails to indicate this limitation on the form authorizing Valerie to return to work. The only evidence of medical treatment for this condition is a February 1995 report that indicates that Valerie was treated for "multiple bouts of abdominal pain and multiple movements of diarrhea," and a report that indicated that on February 16, 1995, Valerie was treated for irritable bowel syndrome. However, a March 12, 1995 report indicates that Valerie's condition was improving with rest and medication.

Valerie Sacay's Disability Claim Under the Rehabilitation Act
Section 504(a) of the Rehabilitation Act provides in relevant part that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The ADA's definition of disability is drawn almost verbatim from the statutory language of the Rehabilitation Act, Bragdon, 118 S.Ct. at 2202, and the terms common to both regulatory schemes are to be interpreted *630 in the same way, Stone v. City of Mount Vernon, 118 F.3d 92, 96 (2d Cir. 1997), cert. denied 522 U.S. 1112, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998). To bring a claim under the Rehabilitation Act, a plaintiff must show, as under the ADA, that her impairment qualifies as a disability that substantially limits a major life activity. See 29 U.S.C. § 794(d). Valerie's claim of discrimination under the Rehabilitation Act is subject to the same flaws as her claim under the ADA.

Melanie Sacay's Associational Discrimination Claim
The ADA prohibits an employer from "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4). The purpose of this provision is to ensure that a qualified employee is not discriminated against because an employer assumes, without foundation, that the employee's association with a person with a disability, such as HIV/AIDS, will require the employee to miss work or frequently leave work early in order to care for the disabled person. In order to establish a prima facie case of associational discrimination under the ADA, a plaintiff must demonstrate that:
1) the plaintiff was "qualified" for the job at the time of the adverse employment action; 2) the plaintiff was subject to adverse employment action; 3) the plaintiff was known by his employer at the time to have a relative or associate with a disability; and 4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision.
Dollinger v. State Insurance Fund, 44 F.Supp.2d 467, 480 (N.D.N.Y.1999). Melanie's associational discrimination claim under the ADA fails because she has not shown she was known by her employer to have a relative with a disability under the ADA. As discussed above, Melanie's mother was not disabled. See Jonathan L. Sulds, New York Employment Law, Vol.2 § 24.161[1][b][v].

Valerie Sacay's Retaliation Claim Under the ADA, the Rehabilitation Act, the NYSHRL, and the NYCHRL
In order to state a claim for retaliation under the ADA or the Rehabilitation Act, a plaintiff must show that: (1) she engaged in an activity protected by the ADA; (2) the employer was aware of that activity; (3) an adverse employment action occurred; and (4) a causal link exists between the protected activity and the adverse employment action. See Muller, 187 F.3d at 311. New York courts apply the same analysis for retaliation claims under state laws as under federal law. See Hendler v. Intelecom USA, Inc., 963 F.Supp. 200, 211 (E.D.N.Y.1997) (citing New York State Office of Mental Retardation & Developmental Disabilities v. New York State Div. Of Human Rights, 164 A.D.2d 208, 563 N.Y.S.2d 286 (3d Dep't 1990)).
In order for a plaintiff to show that she engaged in protected activity, she does not need to prove that she was actually disabled, she only needs to show that she possessed a good faith, reasonable belief that the employer's action violated the ADA. Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224 (2d Cir.2000). A causal connection may be established by showing that the protected activity was followed closely by retaliatory treatment, that an employee who engaged in protected activity was treated differently from fellow employees who engaged in similar conduct, or through direct evidence of retaliatory animus directed against the defendant. *631 Johnson v. Palma, 931 F.2d 203, 207 (2d Cir.1991).
Once a prima facie case has been established, the employer must articulate a legitimate, non-discriminatory reason for having taken the action of which the plaintiff complains. Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Johnson, 931 F.2d at 207. If this is done, the burden shifts back to the plaintiff to prove that the allegedly legitimate reason is merely a pretext for discrimination. McDonnell Douglas Corp., 411 U.S. at 804, 93 S.Ct. 1817; Johnson, 931 F.2d at 207. However, "a reason cannot be proved to be a `pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (citation omitted); see also Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (holding that the fact-finder may infer discrimination from the falsity of the employer's explanation). In the summary judgment context, St. Mary's requires a plaintiff to "establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." Gallo v. Prudential Residential Services Ltd., Partnership, 22 F.3d 1219, 1225 (2d Cir.1994).
Valerie has established a prima facie case of retaliation. First, she has shown that she engaged in protected activity by complaining to the Human Resources Department on January 4, 1995, January 9, 1995, and February 9, 1995. See Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 65 (2d Cir.1992) (holding that making an internal complaint of sexual harassment to management is a protected activity for purposes of a retaliation claim under Title VII). Defendants claim that Valerie's January 9, 1995 conversation with Zummo does not constitute a complaint of discrimination on the basis of disability because Valerie explicitly stated that she was not disabled and that she has never requested an accommodation. However, immediately prior to making this statement, Valerie had inquired about how to file a claim of discrimination under the ADA, making explicit reference to the ADA, and Valerie has testified that she was unsure what Zummo meant by "disabled" and that she thought he was asking whether she ever filed a formal complaint. In addition, Valerie's February 9, 1995 letter referred to "unfair and improper treatment and raises the possibility of an ADA issue." These facts raise a genuine issue about whether Valerie made an internal complaint of discrimination under the ADA.
In any event, Valerie engaged in protected activity under the ADA when her attorney requested a reasonable accommodation in an April 17, 1995 telephone conversation. See Muller v. Costello, 1996 WL 191977 *6 (N.D.N.Y.), aff'd 187 F.3d 298 (2d Cir.1999) (holding that a request for a reasonable accommodation is a protected activity under the ADA). Defendants rely on Rosa v. Brink's Inc., 103 F.Supp.2d 287 (S.D.N.Y.2000), which granted summary judgment to an employer on a retaliation claim where the employer terminated an employee upon being notified that the employee was returning from sick leave. However, unlike the present case, the court held that there was no evidence that the employee had filed a *632 complaint or requested an accommodation prior to her termination. See id.
It is uncontested that defendants had knowledge that Valerie engaged in the protected activities of filing complaints and seeking reasonable accommodation, and that Valerie's termination constitutes an adverse employment action. Defendants, citing Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir.1990) and Brower v. Continental Airlines, Inc., 62 F.Supp.2d 896, 907 (E.D.N.Y.1999), argue that there is no evidence of a causal connection between Valerie's protected activities and her termination because Valerie was not terminated until about three months after filing her complaints. However, unlike in Hollander and Brower, Valerie was out on sick leave when she filed her complaints, and she was terminated 14 days after notifying defendants that she was returning to work.
Further, a reasonable jury could conclude that defendants were contemplating terminating Valerie during her absence. On January 20, 1995, 16 days after Valerie's first complaint and 11 days after her second complaint, Persico called to arrange for the removal of computer equipment that had been in Valerie's home since 1992. While Persico claimed that the equipment was needed in the office, and that she did not want Valerie working while she was out on sick leave, a reasonable jury could conclude that these reasons were false and that an intent to terminate Valerie was the real reason for retrieving the computer from the fact that 15 days later, on February 5, 1995, an advertisement placed by defendants appeared in the New York Times for a Database Assistant Manager, which had a job description and salary that a jury could conclude were similar to Valerie's job and salary. Moreover, Valerie's lawyer claims he requested a reasonable accommodation only 6 days before defendants notified Valerie of her termination. These facts are more than sufficient to meet the minimal requirements of establishing a prima facie case. See St. Mary's Honor Ctr., 509 U.S. at 506, 113 S.Ct. 2742.
The legitimate, non-discriminatory reason for Valerie's termination articulated by defendants is that BCACE was under severe fiscal restraints and that, once defendants made the decision to outsource the catalog, it was no longer economical to pay Valerie's salary just for the database production. It is undisputed that BCACE ran operating deficits of $81,000 in fiscal year 1994, of $147,000 in fiscal year 1995, and of $129,000 in fiscal year 1996. Further, in fiscal year 1995, defendant eliminated three full-time positions in addition to Valerie's position and three part-time positions.
However, Valerie has raised a genuine issue of material fact whether these articulated reasons for her termination are a pretext for retaliation. First, defendants were facing the same operating deficits in November 1994, when Valerie's contract was renewed, as in April 25, 1995, when Valerie was terminated. In fact, both events occurred in the same fiscal year.
Defendants also argue that once the decision to outsource the catalog was made, it was no longer economical to pay Valerie's salary merely for her database duties. However, a reasonable jury could conclude that defendants made the decision to outsource the catalog prior to renewing her contract in November 1994. At a November 11, 1994 meeting, Morris and Persico indicated that Valerie could outsource her catalog duties, and at a November 28, 1994 staff meeting, Morris announced that Valerie would no longer work on the catalog. The next day, November 29, 1994, defendants renewed Valerie's contract for six months and indicated that Valerie "is expected to be reappointed on 7/1/95."
*633 Further, defendants' claim that it was not economical to retain Valerie once the catalog was outsourced is undermined by the fact that on February 24, 1995, about a month and a half before Valerie was informed of her termination, defendants placed an advertisement indicating that they were willing to pay up to $32,000 for a Database Assistant Manager to perform functions that appear similar to Valerie's database duties. This salary is only $5,000 less than Valerie was earning at the time, and the advertisement does not indicate that the applicant would have to supervise catalog production, which was part of Valerie's job requirements. A reasonable jury could conclude from this sequence of events that a desire to reduce costs was a pretext for retaliation. Valerie's testimony that she heard, over the telephone, Morris enter her office and ask Valerie's assistant to return a memorandum requesting that Valerie cancel her physical therapy appointment several hours after Valerie filed a complaint that she thought Morris had violated the ADA by scheduling a meeting during her physical therapy only strengthens her argument that she was terminated for complaining about not being given a reasonable accommodation.
Finally, defendants point to the fact that three other full-time employees and three part-time employees were terminated in fiscal year 1995 as evidence that their budgetary reasons for terminating Valerie were not pretextual. However, Persico's discussion of these other terminations raises an issue of fact as to pretext. In a memorandum dated May 30, 1995 from Persico to Zummo, Persico states that "[w]e already eliminated five full-time positions (3 at your recommendation to support our claim that Val's position was eliminated due to budget cuts) in the past 18 months and we're dangerously understaffed." Defendants argue that this statement is taken out of context because this memorandum was written in response to a request by Zummo for documentation about how many employees had been terminated for budgetary reasons and the other employees were terminated before plaintiff. However, this does not explain why Persico stated that the terminations were made to "support our claim" that Valerie had been terminated for a legitimate reason. The memorandum raises a genuine issue of material fact that the articulated reason for Valerie's termination was pretextual and that retaliation was the true reason, and the interpretation of the memorandum is a question of fact to be determined by a jury.
Melanie Sacay's Retaliation Claim Under the ADA, the Rehabilitation Act, the NYSHRL, and the NYCHRL
Melanie claims that defendants retaliated against her because both she and her mother engaged in protected activity. As an initial matter, it is unsettled whether an employee who is retaliated against because a relative, who works for the same employer, has engaged in a protected activity has third-party standing to assert a claim for retaliation. The Court of Appeals for the Second Circuit has not yet decided whether such a claim exists, Thomas v. American Horse Shows Association, Inc., 205 F.3d 1324 (2d Cir.2000), and Courts of Appeals for other circuits and District Courts in this circuit have split on the issue. Compare, e.g., Equal Employment Opportunity Commission v. Ohio Edison Co., 7 F.3d 541, 542-44 (6th Cir.1993) (holding that allowing third-party standing for employees who are retaliated against because a relative has engaged in protected activities serves the statutory purpose of ensuring that employees are not deterred from engaging in protected activity by the threat of retaliation); Gonzalez v. New York State Department of Correctional Services, 122 F.Supp.2d 335, 347 (N.D.N.Y.2000) (same) with Smith v. Riceland Foods, Inc., 151 F.3d 813 (8th Cir.1998) (holding that allowing third-party *634 standing contradicts the plain statutory language and will rarely be necessary to protect relatives from retaliation); Holt v. JTM Industries, Inc., 89 F.3d 1224, 1227 (5th Cir.1996), cert. denied 520 U.S. 1229, 117 S.Ct. 1821, 137 L.Ed.2d 1029 (1997) (same). This court need not resolve the issue because Melanie has raised a genuine issue of material fact that she engaged in protected activity by writing a letter on June 5, 1995 in support of her mother and her mother's exercise of rights under the ADA.
Defendants argue that Melanie has failed to meet her burden of showing that her transfer to Metrotech Center and subsequent revised job description was an adverse employment action. Even if this were an adverse employment action, defendants argue that Melaine has not shown that their articulated reasons, namely her retaliation against defendants by choosing a color for the catalog which made it illegible, her tardiness, and her improper behavior with vendors, were pretextual and that retaliation was the true reason. However, based on the evidence presented by Melanie that she had been supervising other employees under her old job description, but was supervised under her revised job description, Melanie has raised a genuine issue of material fact as to whether her transfer, with a revised job description, constitutes an adverse employment action. Further, based on the evidence presented by Melanie that she did not choose the color of the catalog, that she was not tardy and properly completed the time sheets, that defendants did not learn about her misbehavior with the vendors until after the transfer, and that Persico told Melanie that the transfer was "because [defendants] are presently engaged in a labor dispute with [Melanie's] mother," Melanie has raised a genuine issue of material fact as to whether defendants' articulated reasons for this employment action are pretextual and retaliation was the true reason.

Melanie Sacay's First Amendment Claim Against Persico in her Individual Capacity
Melanie brings a claim pursuant to Section 1983 against Persico in her individual capacity alleging that she violated Melanie's First Amendment right to intimate association with her mother. The Supreme Court has held that the choice "to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." Roberts v. United States Jaycees, 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). Melanie relies on Adler v. Pataki, 185 F.3d 35 (2d Cir.1999), which held that a husband who claimed he was terminated from his state job in retaliation for his wife's filing a First Amendment suit against the State could bring a claim for undue state interference in an intimate relationship, and Sutton v. Village of Valley Stream, 96 F.Supp.2d 189, 193 (E.D.N.Y.2000), which extends Adler to the parent-child relationship.
As an initial matter, Persico's argument that this court should not follow Sutton and extend Adler to the parent-child relationship is rejected. The Supreme Court has stated that:
Family relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life. Among other things, therefore, they are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship. As a general matter, only relationships with *635 these sorts of qualities are likely to reflect the considerations that have lead to an understanding of freedom of association as an intrinsic element of personal liberty.
Roberts, 468 U.S. at 619-20, 104 S.Ct. 3244. Sutton's conclusion that there is no logical reason for holding that a parent-child relationship is any less worthy of constitutional protection than the husband-wife relationship based on this criteria is sound. See Sutton, 96 F.Supp.2d at 193.
Nevertheless, Melanie's First Amendment claim must be dismissed because she has failed to present any evidence that her transfer and demotion burdened her relationship with her mother. Even if Adler does not require that a plaintiff show any actual burden on the relationship, Persico would be entitled to qualified immunity. Public officials are:
entitled to qualified immunity from claims for damages if (1) their conduct did not violate federal statutory or constitutional rights that were clearly established at the time, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. In determining whether a right was clearly established, we consider (1) whether the right in question was defined with reasonable specificity, (2) whether the decisional law of the Supreme Court and the applicable circuit court supported the existence of the right in question, and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.
Brown v. Oneonta, 106 F.3d 1125, 1130-31 (2d Cir.1997).
It was objectively reasonable for Persico to believe that her actions did not violate clearly established constitutional law. Adler, which was decided after Melanie's transfer and demotion, recognized that "[j]ust as the source of a right of intimate association has varied, so has the standard applied in determining whether the right has been violated." Adler, 185 F.3d at 43. Adler recognized that sometimes the Supreme Court has held that the right to intimate association was not violated unless the challenged action had the likely effect of ending the intimate relationship. See id. (citing Lyng v. International Union, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988) and Califano v. Jobst, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228, (1977)). According to Adler, in other cases, the Supreme Court has found the right to intimate association is burdened if the challenged action is arbitrary or an undue intrusion into the marital relationship. See id. (citing Roberts 468 U.S. at 618, 104 S.Ct. 3244). While stating that "the matter is not free from doubt," Adler adopted the latter approach. Id. at 44.
Thus, while the existence of a right to intimate association had been clearly established by Supreme Court precedent when the conduct in question occurred, the scope of this right was not defined with reasonable specificity. See id.; Sutton, 96 F.Supp.2d at 194. Furthermore, it was objectively reasonable for Persico to believe her acts did not violate the right to intimate association because, under the "likely effect of ending the protected relationship" standard sometimes applied prior to Adler, Persico's actions did not have the likely effect of ending the relationship between Melanie and Valerie. Cf. Patel v. Searles, 2000 WL 1731338 (D.Conn.2000) (finding no qualified immunity where, under the "likely effect of ending the protected relationship" standard, the officers had violated plaintiff's First Amendment rights).

Supplemental Jurisdiction Over State Law Claims
28 U.S.C. § 1367(a) gives the district courts supplemental jurisdiction over claims "that are so related to claims in the *636 action" over which the court has original jurisdiction "that they form part of the same case or controversy under Article III of the United States Constitution." Under that provision, this court will exercise supplemental jurisdiction over the state law retaliation claims of both plaintiffs. However, the court will not exercise supplemental jurisdiction over the state law discrimination claims. All federal discrimination claims have been dismissed. Unlike the state retaliation claims, the state discrimination claims are not "part of the same case or controversy" as the sole remaining federal claims, which are for retaliation. Even if they were, supplemental jurisdiction would be declined under 28 U.S.C. § 1367(c)(1) and (2). As the Second Circuit has recently noted, in Giordano, 274 F.3d at 754, New York State and City discrimination laws differ significantly from federal discrimination law; and they involve potentially complex and novel issues of state law. In addition, if they were not dismissed but went to trial, the State and City discrimination claims would substantially predominate over the federal retaliation claims. See id. Therefore, the State and City discrimination claims will be dismissed without prejudice.

Conclusion
Defendants' motions for summary judgment against Valerie and Melanie Sacay are granted in part and denied in part. All the claims brought by Valerie and Melanie Sacay against CUNY, Brooklyn College, and Persico in her official capacity, which are limited to claims for damages, are dismissed under the Eleventh Amendment.
Valerie and Melanie Sacay's claims of discrimination based on disability against the Research Foundation, Morris in both her official and individual capacity, and Persico in her individual capacity under the ADA, the Rehabilitation Act, and § 1983 are dismissed on the merits. Melanie Sacay's First Amendment claim is also dismissed on the merits.
Defendants' motions for summary judgment on Valerie and Melanie Sacay's retaliation claims under the ADA, the Rehabilitation Act, the NYSHRL, and the NYCHRL are denied. Melanie Sacay has indicated an interest in moving for leave to amend to add claims for injunctive relief against CUNY, Brooklyn College, and Persico in her official capacity. The parties are to agree on a briefing schedule for this motion and serve and file any motion that is made according to my rules. Any motion must be limited to Melanie Sacay's retaliation claims, which are the only claims of Melanie that survive the motion for summary judgment.
Valerie and Melanie Sacay's discrimination claims under the NYSHRL and the NYCHRL are dismissed without prejudice.
SO ORDERED.
NOTES
[1] In order to differentiate the two plaintiffs, they sometimes will be referred to by their first names rather than by their last name.
[2] In a subsequent declaration, Valerie claims she told Murphy her "supervisors were harassing me and had directed me to reschedule a therapy appointment. I expressed to her that I believed they were discriminating against me because of my disabilities and that I had never had any problems with them about my responsibilities prior to my informing them that I needed some relief because of my disabilities."
[3] Valerie brings a claim under 42 U.S.C. § 1983 against Persico in her individual capacity for disability discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment. Valerie cites no authority in support of her contention that a plaintiff may bring a claim of employment discrimination based on disability under the Equal Protection Clause. Even assuming that such a claim were available, plaintiffs offer no authority for the proposition that the standard for determining disability is more lenient than the standard under the ADA and the Rehabilitation Act. Therefore, even if plaintiff could bring such a claim, it is dismissed for the same reasons as her ADA and Rehabilitation Act claims against the Research Foundation are being dismissed.